556 A.2d 854

Caleb MILNE

v.

Karen MILNE and David Milne, IV.

Appeal of Karen MILNE.

Superior Court of Pennsylvania.

Argued Dec. 18, 1987.

Filed March 22, 1989.

178

Rachel Munafo, Philadelphia, for appellant.
Norton A. Freedman, Lansdale, for Caleb Milne, appellee.
David S. Rasner, Philadelphia, for David Milne, appellee.

Before CIRILLO, President Judge, and CAVANAUGH, BROSKY, ROWLEY, McEWEN, OLSZEWSKI, MONTEMURO, POPOVICH, and JOHNSON, JJ.

OPINION BY CIRILLO, President Judge:

Karen Milne appeals from a support order entered by the Court of Common Pleas of Montgomery County requiring her to contribute the sum of $3,250 per year toward the college expenses of her estranged son, Caleb Milne. We affirm in part and vacate in part.

Karen Milne separated from her husband, appellee David Milne, IV, in December, 1984 after a twenty-two year marriage.[1] During their marriage, the couple had two children. At the time of the separation, the younger child, Caleb Milne, was a senior in high school. At first, Caleb continued to reside in the marital home with his mother. However, Caleb became estranged from his mother and, in March of 1985, he voluntarily moved in with his father. Karen Milne testified that prior to Caleb's departure, he engaged in several arguments with her which erupted into physical attacks on her. On one occasion, Caleb spit in his mother's face. More than once, he pushed her so that she fell down and at least twice, he struck her.

After Caleb left his mother's house, he ceased all communication with her. In the fall of 1985, he entered the University of Richmond in Virginia. He completed his freshmen year there, attaining a 3.0 grade point average. All of Caleb's expenses during his freshmen year were paid for by his father, whom Caleb lived with during the time he was not in residence at the university.

In February of his freshmen year, David Milne, IV, filed a petition for special relief on behalf of his son. This petition requested the court to issue an order permitting Caleb access to his mother's house to obtain his personal belongings. In support of the petition, Caleb appeared in court to testify against his mother.

1. An action for divorce was pending at the time of the support hearing.

During the summer following Caleb's freshmen year in college, Caleb was admitted to Occidental College in California for the completion of his undergraduate studies. When this college admitted him, he filed a complaint in child support against his mother and father to secure financial assistance in meeting his anticipated college expenses at Occidental College. He specifically alleged that his mother had neglected her duty to sufficiently support him.

An expedited hearing on the support complaint was held on September 4, 1986, at which the Honorable William T. Nicholas heard testimony of Caleb and his parents. Shortly thereafter, Judge Nicholas entered an order directing David Milne, IV to pay his son's entire tuition, room, board, and transportation to and from California. In the order, the court also concluded that Karen Milne's estrangement from her son was insufficient to excuse her duty to contribute to her son's college education and directed her to reimburse David Milne, IV the sum of $3,250 toward Caleb's college education expenses. Following entry of the court's order, Karen Milne filed an appeal to this court.

■ While Ms. Milne's appeal was originally decided by a panel of this court, we granted her petition for reargument because of the importance of the following issue of first impression: does an adult child's willful estrangement from his or her parent excuse that parent's duty to contribute to the child's college education.[2] We conclude that estrange-

2. This issue was addressed in dicta in *DeWalt v. DeWalt,* 365 Pa.Super. 280, 529 A.2d 508 (1987), and was the subject of President Judge Cirillo's concurring opinion in *Chesonis v. Chesonis,* 372 Pa.Super. 113, 538 A.2d 1376 (1988), which was decided on other grounds.
There is a dearth of case law addressing this issue in other jurisdictions. It would be refreshing to think that there are so few cases because adult children who have repudiated their parents have either realized that such action is accompanied by the responsibility to do for themselves or, at least, that they do not have the bad manners to cast off a parent and later sue them for the help most parents would give willingly if relations were intact.
The issue has been raised in some cases but not addressed as the decisions have been made on other grounds. *See e.g., Price v. Price,* 395 Mich. 6, 232 N.W.2d 630 (1975) (breakdown in father-son relationship; father argues he should not have to continue paying for college

ment should be a consideration in determining whether to award educational support for an adult child.[3] In this case, we find that Caleb's total abandonment of his mother relieves her of the duty to contribute to Caleb's college expenses. Consequently, we vacate the portion of the trial court's order requiring Karen Milne to contribute to the college expenses of her son, Caleb.

Pennsylvania is counted among the "enlightened" jurisdictions that permit divorce without fault. Pennsylvania can also be considered enlightened in concerning itself with the futures of the children of those divorces. It is one of at least nineteen jurisdictions that, under some circumstances, require those divorced parents to contribute to the college educations of their offspring beyond the age of eighteen. Moore, *Parents' Support Obligations To Their Adult Children*, 19 Akron L.Rev. 183, 184 (1985) (hereinafter *Moore*); Horan, *Postminority Support for College Education—A Legally Enforceable Obligation in Divorce Proceedings?* 20 Fam.L.Q. 589, 596 (1987) (hereinafter *Horan*). This is a departure from the historical application of the common law and interpretation of support statutes.

At common law the duty to support a child and provide him or her with the necessities of life carried with it the

education of son whose lifestyle he does not approve; decided on statutory grounds); *Hight v. Hight,* 5 Ill.App.3d 991, 284 N.E.2d 679 (1972) (less than satisfactory relationship between father and daughter found to be of mutual origin; father's argument that his contribution is a penalty and that daughter did not consult him about college did not make award abuse of discretion). Those few cases in which the issue has been squarely addressed or have been dispositive will be discussed later in this opinion.

**3.** While this opinion speaks only of the qualified duty of divorced parents to support an adult child in college, there is a commensurate duty of support on the part of divorced parents of adult children who are pursuing some type of accepted vocational or career pursuit which, like college, entails a temporary inability to be fully self-supporting. *See Kopp v. Turley,* 359 Pa.Super. 106, 518 A.2d 588 (1986) (the duty to support a college-age child continues even though the child attends a commercial art school rather than college). The same test which is applied in determining whether support should be awarded to adult children in college should be applied to determine whether parental support should be awarded to adult children seeking some other type of accepted education.

right of association and was reciprocal in that parents had a right to the child's services. *Note, Support Obligations of the Non–Custodial Parent for Private Secondary and College Education: Toward a Uniform and Equitable Resolution,* 16 Suffolk U.L.Rev. 755 (1982) (hereinafter *Parental Support Obligations* ), n. 5 and cases cited therein; *Post Majority Support: Oh, Dad, Poor Dad,* 44 Temple L.Q. 319, 325 (1971) (hereinafter *Post Majority Support* ). Today, this duty is absolute with regard to a minor child and does not depend on access of the parent to the child. *Melzer v. Witsberger,* 505 Pa. 462, 472, 480 A.2d 991, 996 (1984). It is the extension of this common law duty of support on which the courts of this Commonwealth most often ground their jurisdiction to award post-minority support. Our support statutes do not restrict the term "child" to minors, thereby leaving the way clear to award support to protect the welfare of children beyond the age of majority.[4] *Horan, supra* at 596.

The most common reason for seeking support beyond the age of eighteen is postsecondary education. As we said in *Verna v. Verna,* 288 Pa.Super. 511, 432 A.2d 630 (1981):

> [T]he presumption is when a child reaches majority the duty of a parent to support that child ends.... The duty to support the adult child continues where the child is physically or mentally feeble or otherwise unemployable. The adult child, however, has the burden of proving the conditions that make it impossible for her or him to be employed.

*Id.,* 288 Pa.Superior Ct. at 515, 432 A.2d 632 (citations omitted). Until the lowering of the age of majority to eighteen, the issue of requiring divorced parents to support

---

**4.** These statutes, as cited in *Post Majority Support, supra,* at 322 n. 14, include: Pa.Stat.Ann. tit. 18 § 4733 (1963) (penal offense of desertion and non-support); Pa.Stat.Ann. tit. 11 § 38 (1965) (parent's responsibility for indigent persons); Pa.Stat.Ann. tit. 62 § 1973 (1968) (relative's responsibility for indigent persons); Pa.Stat.Ann. tit. 71 § 1783 (1962) (relative's responsibility for inmates of state institution); Pa. Stat.Ann. tit. 48 § 131 (1965) (actions for support and maintenance). *See also* 23 Pa.C.S. § 4321 (1985) which refers specifically to support of "children" over the age of eighteen.

children who were attending college did not arise as frequently. *Horan, supra* at 599; *Parental Support Obligations, supra* at 763. Initially, parents would not be compelled to provide such support unless they had agreed to do so. *Commonwealth ex rel. Ulmer v. Sommerville,* 200 Pa.Super. 640, 643, 190 A.2d 182, 183 (1963).[5] Our courts now go beyond any agreement of the parties to impose an obligation to lend assistance for college whether or not any promise was ever even implied. *Id.,* 200 Pa.Superior Ct. at 643, 190 A.2d at 184. Increasingly, a college education is being viewed as a necessity. *Parental Support Obligations, supra,* at 756 n. 7; *Post Majority Support, supra* at 336; *see also Commonwealth ex rel. Stump v. Church,* 333 Pa.Super. 166, 481 A.2d 1358 (1984). However, the duty to support a college-bound youngster who has attained his or her majority remains a qualified one.

An award made after majority for contribution to college expenses is made within the discretion of the court. This exercise of discretion is bounded by a judicially promulgated test consisting of two factors: the desire and ability of the child to successfully pursue post-secondary education and the ability of parents to contribute to that effort without undue hardship. *Commonwealth ex rel. Ulmer v. Sommerville,* 200 Pa.Super. at 643, 190 A.2d at 184–85. In this Commonwealth, the above test has proven to be useful as a guideline for determining entitlement and in setting such awards. Adherence to it has also served the judiciary as welcome blinders, shielding it from some of the thornier

5. One of the rationales preceding the current trend toward awarding postminority support for educational assistance, with or without an agreement to do so, is expressed by the following:

[I]n a free society the law should force one adult to subsidize another only in compelling circumstances; and, a young adult's desire to attend college, however laudable it may be, cannot reasonably be said to meet this test. If the ambition and aptitude are present, it is probable that the aspiring student will find a way to obtain his education without making his reluctant and financially-pressed parent help pay for the same; and, such a graduate will have attained, along with his degree, an appreciation of what industriousness and self-discipline can accomplish.

*Moore, supra,* at 195–96.

aspects of this judicial imposition of extended parental duties. Neither of these elements exists in a vacuum. It is therefore necessary for the trial court to examine and weigh a number of factors peculiar to each case before determining a result.

Our case law reveals that we have already begun to look at factors outside the narrow two factor test when considering support awards for educational expenses. *See Sutliff v. Sutliff,* 515 Pa. 393, 403, 528 A.2d 1318, 1322 (1987) ("earnings of college age children may be considered ... [as may] funds placed in trust for the benefit of a child or for support or education"); *Chesonis v. Chesonis, supra* (independent means of a college age child may be considered); *Francis v. Francis,* 358 Pa.Super. 391, 517 A.2d 997 (1986) (support for private school expenses depends, *inter alia,* on whether such expense is a reasonable expectation with regard to the standard of living of that family); *Commonwealth ex rel. Stump v. Church, supra* (reasonable expenses for maintenance of child are determined with view toward social station of family); *DeVergilius v. DeVergilius,* 329 Pa.Super. 434, 478 A.2d 866 (1984) (assets of children considered); *Melzer v. Witsberger,* 505 Pa. 462, 480 A.2d 991 (1984) (expenses for support must be reasonable in view of social station in life); *Commonwealth ex rel. Smith v. Smith,* 217 Pa.Super. 1, 268 A.2d 161 (1970) (father's promise to daughter that he would send her to college considered in affirming support award); *Commonwealth ex rel. O'Hey v. McCurdy,* 199 Pa.Super. 115, 184 A.2d 291 (1962) (child's attendance at private schools before divorce and fact that father had attended private schools considered).

We have also been faced with cases which ask collateral questions. For example, is there to be an age beyond which an adult child cannot benefit from such an award? On first blush, the two-pronged test set forth above would lead one to believe there was no age limit. However, in *DeWalt* this court was called on to address just such a question. We held that, absent extraordinary circumstances, a parent

could not be held responsible for college aid after a child's twenty-third birthday. *DeWalt, supra* 365 Pa.Super. at 289–91, 539 A.2d at 513–14. We have also been called upon to decide whether a non-custodial parent can be made to contribute to graduate school. *See Brown v. Brown*, 327 Pa.Super. 51, 474 A.2d 1168 (1984) (trial court misapplied existing law to include professional training of an emancipated adult child among the obligations of a divorced parent); *Colantoni v. Colantoni*, 220 Pa.Super. 46, 281 A.2d 662 (1971) (father not required to contribute to support of twenty-four year old married child in medical school). These questions call upon our courts to take into account a wider scope of issues than our current two-pronged test is capable of addressing. No case shows the inadequacy of our current test more than the one at bar.

There is in this case, as with many family matters before our courts, evidence of bitterness. The availability of money for Caleb to attend school appears to be the least of the matter. There is the suggestion that the father, versed in the law, has used this training as a cudgel to make life more difficult for his ex-wife. Even sadder, it seems that their son has taken sides and joined forces with his father against his mother. Let us not forget that this action pits son against mother. Caleb Milne and his mother are estranged. It is undisputed that it was Caleb's unilateral choice to leave his mother's house. Caleb's testimony shows his feelings of justification in cutting off relations with his mother and his lack of desire to improve them. The record indicates that, while her attempts to stay in contact with him have not been successful, she has made some efforts to leave the door open for his approach, should he wish to do so. Her ability or success as a wife has little to do with her role as a mother. It is within the scope of this role, and its legal obligations, that our decision in this matter rests. One would hope that in the interim since this action was begun, some healing has taken place so that our decision today is no longer necessary. There is little doubt that this is a sad situation.

Perhaps, the single most compelling piece of evidence in this case is Ms. Milne's testimony that her son "spat in my face and shoved me so that I fell over. He never spat but once. He did push me more than once. He struck me at least twice." That any father would condone, let alone encourage, a son who has so abused his mother in taking legal action against her shocks the sensibilities of this writer. The dissent would add insult to injury by finding that Caleb is entitled to exact funds for college from his mother's already strained resources. Such compounding of the tragedy of this family cannot be countenanced. To do so would be to relieve Caleb of any responsibility for his actions, which were taken as an adult, however embittered. Neither the passage of time, so favored as a panacea by the dissent, nor Caleb himself have done anything to mitigate the harm of his actions.

By refusing to perfunctorily apply the two-pronged test in this case, we are announcing that we are not content to focus on the pragmatic aspects of the case—the wiseness of the investment (Caleb's aptitude to do college work) and the feasibility of making it (Karen Milne's ability to pay)—to the exclusion of familial aspects so undeniably central to the policy concerns giving rise to our intervention in this area. We refuse to champion the importance of post-secondary education over that of adult responsibility.

Courts are traditionally, and for good reason, reluctant to cross the threshold of the family dwelling, for so far as they venture beyond that threshold, they have intruded. This caution undoubtedly underlies the dissent's avoidance of the issues in this case. The dissent is loathe to become involved in what it characterizes an adversarial proceeding to determine fault between parent and child. The view that courts should not interefere in family relationships is a fine approach, unless by taking it, the court allows greater evil than that which it attempts to prevent.

█ The objective of the court is extending its protection to adult children of divorced parents is to ensure that they

are not unjustly—and that is the key word—deprived of opportunities they would otherwise have had, had their parents not divorced.[6] The role of the courts in this endeavor should be one of substituting its judgment, as nearly as possible, for that of the parents. But this should not be done mechanically or arbitrarily. In essence, the court stands in loco parentis in making such decisions. For that reason, we must put ourselves in the shoes of each parent whose case comes before us. Since each case presents unique individuals and circumstances, it is incumbent upon our judiciary to fashion each decision with the best interests of the whole family in mind.[7]

In an intact family, there is mutual discussion of the desired choice of school and the affordability of the choice.[8] Parents exercise some control over the adult child by virtue of their provision of financial support.[9] Yet we routinely impose the obligation of educational support for children of divorced parents without making allowance for any input on

6. The unfortunate tendency for children to get caught in the cross-fire between their divorced parents was expressed succinctly in *Childers v. Childers*, 89 Wash.2d 592, 575 P.2d 201 (1978):

   Parents, when deprived of the custody of their children very often refuse to do for such children what their natural instinct would ordinarily prompt them to do.
   *Id.* at 599, 575 P.2d at 208.

7. "The goal of postminority support is not to make wholesale awards of college tuition, but to replicate as closely as possible the decisions the intact family would make." *Horan, supra*, at 607.

8. The states which do not provide for postminority support generally take the position that there is no reason for an able-bodied adult, who is capable of paying his own way through school, not to do so. These jurisdictions do not view being in college as giving rise to a need for support beyond majority. One commentator suggests that the underlying rationale is that "a system of voluntary support to adult children from their parents is more likely to foster a close relationship between parents and children." *Horan, supra*, at 607. *See also Moore, supra*, at 189.

9. *See, e.g., Grapin v. Grapin*, 450 So.2d 853 (Fla.1984):

   While most parents willingly assist their adult children in obtaining a higher education ... such support may be conditional or may be withdrawn at any time, and no one may bring an action to enforce continued payments.
   *Id.* at 854.

the part of the non-custodial parent.[10] This differential treatment is justified on the basis that, because of the divorce, the welfare of those children is the responsibility of the courts and that there is a legitimate interest of the state at stake such that the differential treatment is rational, in constitutional parlance. *Parental Support Obligations, supra,* at 776–77. However, to the extent that the courts of this Commonwealth impose obligations on divorced parents without expecting commensurate responsibilities and respect from adult children, we add to the family's problems rather than alleviate them. Any time one member's interests are elevated over the unit's interest, especially when this is done without any quid pro quo, the already damaged family unit is dealt another blow.[11]

10. Emanuel A. Bertin, a noted Pennsylvania domestic practitioner, is quoted as remarking that, when such an order is entered, there is "no reciprocal order that the child behave in a filial manner toward the parent." He likens the current situation to "biting the hand that feeds" and says, "[u]nder present law, it is a distinct possibility that an 18–year–old youth of divorced parents can tell his mother or father that he rejects each and every value taught him by the parent, plans to live a lifestyle he or she knows to be wholly abhorrent to the parents' principles, informs the parents that he does not wish to and will not have any contact with [them], and, in the same breath, advises the parent the address to which the parent may mail the tuition checks. The lesson being taught is that an adult child of divorced parents may continue to choose his way in the world but at the same time may enlist the aid of the courts to avoid responsibility for those decisions." *Glicksman,* "Honor thy Father and Mother," 10:2. The Pennsylvania Lawyer 11, 12 (March 1988).

11. Not all jurisdictions take our approach and the argument often advanced on behalf of these noncustodial parents is that they should not be required to contribute without having any say in the decisions that are made. In New York, for example, support continues until age 21 but not beyond, absent exceptional circumstances. As long ago as 1978 the Supreme Court of New York County held that attendance at college was not, in and of itself, enough of an exceptional circumstance to extend the parent's financial obligation beyond age 21. *Lord v. Lord,* 96 Misc.2d 434, 409 N.Y.S.2d 46 (1978). In *Roe v. Doe,* 29 N.Y.2d 188, 272 N.E.2d 567, 324 N.Y.S.2d 71 (1971), the court held that reasonable restrictions on the lifestyle of a child for whom educational support was being provided could be imposed by the noncustodial parent providing that support. Similarly, a son's unjustified and arbitrary refusal to visit, call, write, or even see his father created a forfeiture of his right to college support (tied right to see to obligation to support). *Barbara M. v. Harry M.,* 117 Misc.2d 142, 458 N.Y.S.2d 136 (1982).

We must realize that, by allowing them to rely on the courts to settle such disputes, we deprive families of the opportunity to work out their problems and be the shapers of their own destinies. To the extent that we usurp the natural functions of the family unit—including handling fallings out—we put an obstacle in the path of reconciliation rather than removing one. By acting as we do, we assume the responsibility for the decisions that would be made entirely internally in a family if it were still intact. If warring family members can blame the court, they will be less likely to recognize and acknowledge their own culpability. Without a feeling of responsibility for, or participation in, either the decision or the result, there is less incentive for the individual family members to improve relations. A court's decision in this area has complex and far reaching impact.

■ Of necessity, then, a trial court must consider estrangement as a factor in awarding educational support. The addition of this factor will not take the court into a new area of family disputes. We are already there. We already routinely deal with the concept of fault in the context of divorce actions; the legislature has not eliminated that consideration by adopting a no-fault option. We agree with appellant that the rationale that the consideration of estrangement would detract from the two issues which this court has determined to be relevant is logically inconsistent with statutory and case law relating to other issues involving support. For example, the issue of entitlement is a defense to an action for spousal support, *Morley v. Morley*, 283 Pa.Super. 397, 424 A.2d 524 (1981), and misconduct is a factor to be considered in determining alimony, 23 P.S. § 501(b)(14). The support or alimony court is not detracted from its inquiry into the party's ability to pay by its consideration of the entitlement and misconduct issues. Similarly, in being called on to exercise our discretion in determining awards for postminority educational support, we already use factors which demand an evaluation of each

situation, case by case. The inquiry needed to determine estrangement will be no more cumbersome.

■ In giving consideration to estrangement, there are objective factors which can be identified to make the determination of estrangement without going further into a concept of fault than we do now in a divorce context. It will be relatively easy and painless for courts to ascertain whether the parent and child have been in contact since the child's eighteenth birthday and, if so, to get some feel for the nature and quality of their relationship. It will also be simple for courts to inquire into such a child's intentions and desires with regard to his or her relationship with that parent in the future and to find out whether that parent has been consulted at all about the college choice—in short, whether the parent being asked for support is more than just another source of financial aid. It will be no more difficult for courts to refuse to consider factors which are not appropriate to a current determination. For example, we certainly will not consider pre-majority attitudes and behavior, as we all recognize that the maturity and restraint which can be expected of adults is not appropriately applied to evaluate children. But to extend this parental amnesty beyond the age of majority would be irresponsible.

By college age, children of divorced parents must be expected to begin to come to terms with the reality of their family's situation. They must begin to realize that their attitudes and actions are their individual responsibilities. Whatever their biases and resentments, while one can understand how they got that way, when they become adults it is no longer appropriate to allow them to stay that way without consequence. One of a parent's main duties in raising a child is to teach him that he must take responsibility for his actions. The time-honored way in which this is accomplished is to make certain that the child deals with the natural consequences that follow from whatever course of action was chosen. Consider the lesson we are teaching if we allow adult children to use the powers of the state to force a parent whom they have abused and rejected to

contribute to their college education. This kind of message can hardly be considered one which is beneficial for the welfare of those children.

■ If we are to assume that portion of the parental role concerned with deciding whether or not to assist with the college expenses of adult children, we must not shirk our corresponding duty to determine their entitlement to the help for which they ask. And we dare say that in most families, the fact that a child who had abused and rejected a parent and abandoned his or her home would be considered in making such a decision. It is an oft-quoted legal maxim that he who seeks equity, must do equity: he who comes into equity, must come with clean hands. Even the trial judge voiced doubts about Caleb's "standing" to ask for support from his mother:

> It just strikes me that if, in fact, a boy basically walks away from his mother and goes through a year of college and does not ask anything from her, and because of some development in the parents' domestic case may feel there is some advantage to be gained ... Can he be heard to say now at this point, after a year of going to college without her aid, wanting nothing to do with her, okay, now I want money, mom?

We submit that Caleb Milne's abusive behavior and willful estrangement is sufficient reason for this court to refuse to alter his mother's decision not to contribute to his college expenses.

Several jurisdictions have denied support under similar facts. In *Riegler v. Riegler*, 259 Ark. 203, 532 S.W.2d 734 (1976), the estrangement, begun before the child reached majority age, was, at the time of trial, of nine year's duration. The father's refusal to contribute to education costs of his youngest daughter, even though he had helped her older sisters, was upheld where his daughter had "told him to go to hell and declared that the only thing he had to do with her education was to give her the money to spend as she chose." *Id.* at 206, 532 S.W.2d at 736. The father argued that, while he wanted all of his daughters to have a

college education, he "expected them to treat him with the respect due a father and to counsel with him about their college training" if he was to pay for it. *Id.* He indicated that, if she changed her attitude and asked for his help, he would be more than willing to provide it. *Id.* at 210, 532 S.W.2d at 738.

In *Hambrick v. Prestwood*, 382 So.2d 474 (Miss.1980), the nineteen year-old daughter of a noncustodial father was not entitled to have him pay for her college education where she, by her own testimony, intensely disliked him, had no contact with him for six or seven years, and did not want to have any contact with him in the future. The court noted that, while there was nothing in the record that would justify the daughter's feelings, there were indications that her mother had fostered the alienation. *Id.* at 477. We agree wholeheartedly with that court's analysis:

> The duty of a [parent] to send a child to college, under the circumstances of this case, is not absolute. It is dependent, not only on the child's aptitude and qualifications for college, but on whether the child's behavior toward, and relationship with the [parent], makes the child worthy of the additional effort and financial burden that will be placed on [him or her]. Sending children to college is expensive and can cause much sacrifice on the part of parents. It cannot ordinarily be demanded, but must be earned by children through respect for their parents, love, affection and appreciation of parental efforts, none of which are present in this instance....
> Under the unfortunate circumstances of this case, we are of the opinion that the [parent] should be relieved of any further obligations to support or educate this nineteen year-old young lady....
> We continue to adhere to the holding in [Mississippi's seminal case in this area which would support award in the instant case], but this case demonstrates that no rule of law is or should be completely inflexible. The facts of some cases require exceptional treatment and this is one of those. We have simply tried to balance the rights and

obligations of a parent with those of [his or her] nineteen year-old daughter.

*Id.* at 477–78. In *Cohen v. Schnepf,* 115 Misc.2d 879, 454 N.Y.S.2d 785 (1982), an eighteen year-old son had admittedly abandoned his noncustodial parent and was found to have voluntarily asserted his independence from that parent. Support was denied. The court held:

> While it is true that the parental obligation to support a child does not terminate simply because the child is at odds with the parent, it is also true that a child's right to support is not unlimited. A parent has a right to expect a minimum of respect and obedience from his child.

*Id.* at 880–81, 454 N.Y.S.2d at 787 (citations omitted).

In *Riegler, supra,* the Arkansas supreme court framed the issue in this way: "The question in the case at bar ... is not whether appellant is morally obligated to assist her financially while attending college, but the question is whether he is *legally* obligated to do so under the evidence in this case." *Id.* 259 Ark. at 210, 532 S.W.2d at 738 (emphasis in the original). This is precisely the question which this case presents us.

The dissent would not consider the evidence in this case beyond that which is necessary to satisfy the current two-pronged test. This position expresses a general distaste, shared by most in the judiciary, for the necessity of dealing with the messy and often unpleasant business of settling family disputes and applying judicial and legal band-aids in the place of former family bonds. There is an understandable corresponding hesitance to expand the judicial role in family disputes. This reluctance, however, can become untenable when, to do our jobs, the courts *must* venture beyond the established criteria to do equity. It is, after all, in an exercise of our equity jurisdiction that we act in these cases. The cases we see are ones where, for one reason or another, a parent is not amenable to contributing. It is incumbent on us to find out why and to balance the equities before, on the basis of a bright-line test, we overrule a decision made by the child's mother or father. There are

not too many parents who, when asked, will not help a child with his or her education. This case illustrates why, when a divorced parent declines, we need to look beyond the two-pronged test.

If any of us had a child, as in the case at bar, who spat on us or pushed us to the floor, we would not complacently support that attitude. While we may, as adults, be more aware of the reasons for young, hot tempers and the cooling and wisdom that comes with time, and therefore more able to take the long view, we would not like our choice about how to handle such an adult child and whether or not to give him or her aid for college to be dictated to us by the courts. Of course, unless we were divorced parents, the manner in which we made those decisions would be entirely up to us and outside the purview of the courts. If we felt that, so long as an adult child's willful estrangement continued, he or she would receive no monetary support from us, that decision would be unappealable. Karen Milne feels that way; however, her choice is open to question because she is divorced.

Because we, in our role as judicial caretaker of her family, are called on to second-guess her decision, we must be careful that we are fair. It is in the interest of providing her son with no less than he would have gotten if the divorce had not happened that we act at all. Surely, if we ensure that he gets no less, we must be careful also that he gets no more. The value of a college education must be balanced with the traditional family values that have been central to that unit long before a college education was desirable or even possible for most families. To reward the behavior exhibited in this case, or, at the very least, to allow the son to avoid responsibility for it, is counterproductive. A college education will not correct this young man's attitude toward his mother, nor do we put much faith in the approach that "someday he will see the light and mend the fences" approach. The time for action which would take into consideration his egregious behavior was dictated by

Caleb himself when he filed this action for support. We must not let it pass.

When we are discussing Caleb Milne and his needs, we are talking about an *adult*. He must be held accountable for his own actions. With regard to financial help from his mother, by choosing to be separate, he stands on his own. Since he has chosen to act that way toward his mother—and *until* he mends fences—we hold that Karen Milne's obligation to contribute to his college education is suspended. This result is particularly just under the facts of this case since the school for which he seeks funding is one that was rejected as too expensive before the parties separated, and because that school preserves for the son the lifestyle of only his father. His mother clearly could not be said to live at the same level. Caleb is not prejudiced by such a result. His father has been paying for his schooling to date and the trial court found that he had the ability to continue to do so without undue hardship.

By going beyond the "bright line" test to which we have previously adhered, we are joining ranks with other jurisdictions that take a more holistic approach to these awards.[12] Our neighboring state of New Jersey is one example of such a jurisdiction. It takes into account, *inter alia*, the parent-child relationship in deciding whether or not to award postminority support:

[I]n appropriate circumstances, the privilege of parenthood carries with it the duty to assure necessary education for children.... In evaluating a claim for contribution toward the cost of higher education, courts should

12. For a general discussion of these jurisdictions, *see Horan, supra.* That author reports:

Finally, and perhaps most persuasive [in support of postminority awards], is the fact that in states where postminority support is permitted, there is a factual determination of appropriateness done on a case-by-case basis. Courts are not compelled to award support; they are merely given the discretion to do so. In states where such support is permitted, the caselaw has typically evolved a list of factors to be considered by the court as a prerequisite to the award.... includ[ing] ... the child's relationship to the paying parent.

*Id.* at 604.

consider all relevant factors including (1) whether the parent, if still living with the child, would have contributed toward the costs of the requested higher education; (2) the effect of the background, values and goals of the parent on the reasonableness of the expectation of the child for higher education; (3) the amount of the contribution sought by the child for the cost of higher education; (4) the ability of the parent to pay that cost; (5) the relationship of the requested contribution to the kind of school or course of study sought by the child; (6) the financial resources of both parents; (7) the commitment to and aptitude of the child for the requested education; (8) the financial resources of the child, including assets owned individually or held in custodianship or trust; (9) the ability of the child to earn income during the school year or on vacation; (10) the availability of financial aid in the form of college grants or loans; (11) *the child's relationship to the paying parent, including mutual affection and shared goals as well as responsiveness to parental advice and guidance;* and (12) the relationship of the education requested to any prior training and to the overall long-range goals of the child.

*Newburgh v. Arrigo,* 88 N.J. 529, 543–45, 443 A.2d 1031, 1038–39 (1982) (emphasis added). *See also Hardisty v. Hardisty,* 183 Conn. 253, 439 A.2d 307 (1981) (where the court, in considering whether or not to order a father to contribute to private secondary education, took a totality of the circumstances approach). In examining this case, one commentator states:

[B]y evaluating the most salient factors comprising the family's total circumstances, the court attempted to identify the approach which the parties themselves would have taken to educate their child had the marriage not been terminated. Such a comprehensive, standardized analysis of the particular circumstances of the family is crucial to an equitable determination of whether a duty exists... The Courts must be allowed, and indeed required, to consider all relevant factors before exercising their discretion to order educational support for college,

including: the emancipation of the child, the hardship to the [parent], the benefit to the child, and other intangible factors peculiar to the parties.

*Parental Support Obligations, supra,* at 767–68. The *Hardisty* court took into account the financial means of the non-custodial parent, the non-custodial parent's attitude toward the value of private secondary education, the child's academic ability, ambition and special education needs, the adequacy of public schools to fulfill those needs, whether there was a family history of attendance at private schools, the likelihood that child would have attended that school absent the divorce, any implied agreement on the part of the non-custodial parent to send the child to private school, and the right of the custodial parent to make educational choices. *Id.*

While factors such as those mentioned above are often considered informally by our courts now, we now make it clear that estrangement is one of the circumstances to be formally considered in deciding postminority support cases. It should not necessarily be a complete defense to such an action, barring an award, nor even a dispositive factor, but it should be weighed in the equitable balance. The question is not whether we would choose to address certain concerns, but rather whether those concerns need to be addressed in order to reach a just result, one that takes into account the welfare of the child, the good of society and the continued existence of the family. A family includes parents.

▮▮▮ If as an adult, a child repudiates a parent, that parent must be allowed to dictate what effect this will have on his or her contribution to college expenses for that child.[13] We will not provide such a child with the means of

13. In *Ferguson v. Ferguson,* 578 P.2d 1274 (Utah 1978), continued support for an eighteen-year old who wished to attend college was denied pursuant to a statute that made such orders discretionary up to age twenty-one. The court said:

Ordinarily a parent will be more than willing to aid and assist an adult child in securing a college education; however, one should not be compelled to do so by court order, except perhaps in some unusual circumstance ... If he does not have the interests of his

inflicting yet another blow to a parent who has already suffered the deeply painful rejection of his or her child. Just as divorcing parents run the risk of alienating their children, adult children who willfully abandon a parent must be deemed to have run the risk that such a parent may not be willing to underwrite their educational pursuits. Such children, when faced with the answer "no" to their requests, may decide to seek the funds elsewhere; some may decide that the time is ripe for reconciliation. They will not, in any event, be allowed to enlist the aid of the court in compelling that parent to support their educational efforts unless and until they demonstrate a minimum amount of respect and consideration for that parent.

▇ In the case at bar we have more than estrangement, we have total abandonment. Caleb Milne, having voluntarily and forcefully severed the apron strings, is clearly emancipated from his mother.[14] He is under no disability. He is as free of her household as he would be if he married or joined the armed services, common bases for a finding of emancipation.[15] His part-time earnings prove that he is capable of supporting himself. Our seminal case in this area, *Commonwealth ex rel. Ulmer v. Sommerville, supra,* makes a germane point:

> [B]eyond the barest necessities, a father should be required to sacrifice personal comfort in order to provide the necessities of a child too young to support himself. The same exacting requirement should not be demanded of a father to provide a college education for a child able to support himself.

> children at heart that should be a matter of his own conscience and not of the court's ...
> *Id.* at 1275.

**14.** *See Cohen v. Schnepf, supra,* which supports the proposition that a child of divorced parents can be emancipated from one of them.

**15.** In *Kent v. Kent,* 69 Lanc.L.Rev. 139, a Lancaster County Common Pleas judge denied a twenty-one year-old's request for college support after finding she was emancipated. She was living with her boyfriend against her father's wishes and the court concluded that this was sufficient to show that she had left the care and control of her father and was, therefore, ineligible for support from him.

*Id.* 200 Pa.Super. at 643–44, 190 A.2d at 184. Caleb Milne has proven, by his physical acts, that he is an adult, physically superior to his mother. These same actions would provide grounds for a divorce on the grounds of indignities to the person; should not they be enough to constitute the cutting of the umbilical cord? His abandonment of her home and counsel proves that he has declared an end to the unique nurturing his mother provided when he was a child. For all of his growing up years, her contribution—carrying and giving birth to him, night vigils, constant availability and comfort—was made lovingly and in the service of making him able to stand on his own, as he so obviously wishes to do. How are we upsetting the balance of things to deny this adult access to his mother's pocketbook after he has spit in her face and ignored her for over a year? By way of analogy, we terminate parenthood after abandonment for six months where there is "a settled purpose of relinquishing the parental claim" or where there is a "refus[al] or fail[ure] to perform parental duties." 23 Pa.C.S. § 2511(a)(1). Caleb has shown such a "settled purpose" and has failed and refused to show any filial allegiance.[16] Surely, any obligation his mother has to him now is limited to one arising out of mutual love and affection.[17]

16. Even when children are minors, refusal to see, visit or live with divorced parents has resulted in court termination of the obligation of support. *Snellings v. Snellings,* 272 Ala. 254, 130 So.2d 363 (1961); *Putnam v. Putnam,* 136 Fla. 220, 186 So. 517 (1939); *Creeley v. Creeley,* 258 Mass. 460, 155 N.E. 424 (1927), cited in *Commonwealth ex rel. Wallace v. Simoes,* 19 Pa.D. & C.3d 614 (1980) (where by no fault of the parent, a child voluntarily abandons the parent's home, that child's claim to support is forfeited.) Where teenagers of "age of discretion," but not of majority, choose to put themselves beyond parents' effective control and deliberately flout the legitimate mandates of the parent ... the court "is deposed [sic] to let the parties remain in the beds they have made for themselves." *Id.* at 621.

17. The problem with continuing the obligation to support beyond emancipation has long been recognized, as expressed in *Weeks v. Merrow,* 40 Me. 151 (1855), citing *Angel v. McLellan,* 16 Mass. 28 (1819):

Where a child leaves his parent's house, voluntarily ... to avoid the discipline and restraint so necessary for the due regulation of families, he carries with him no credit; and the parent is under no obligation to pay for his support ... To permit the minor, at his

Furthermore, courts should take into consideration the family integrity and personal responsibility of the college-bound adult in deciding whether an award of support should be made. To this end, courts should consider the totality of the family resources, including the adult child's personal assets, if any, and his or her willingness to pursue employment, educational loans and other fiscal resources to contribute to the goal of education and training. Courts should also assess the student's willingness to consider parental counsel as to vocational choices including such factors as institutional setting and the range for personal expenses. Certainly, these factors warrant some consideration when determining a parent's duty to support their child through college.

In summary, we feel strongly that such behavior by an adult child as that evidenced by Caleb should not be endorsed or condoned. The public policy of ensuring that divorce does not deprive young adults of an opportunity for an education is not at issue in this case; the social policy of the sanctity of the family, however, is. It would be more easy and convenient for us to operate at arm's length and look only at our two-tiered test, all the while mouthing wisdom and the virtue of patience. This would not, however, discharge our social responsibilities. To glorify the institution of higher learning at the expense of the institution of the family would be a grave and short-sighted mistake. Today, we therefore expand the two-tiered test heretofore applied in determining whether to award support to an adult child in college.

Based on the foregoing discussion, we find that the trial court abused its discretion in ordering Karen Milne to contribute to the costs of her son's education. Accordingly, we vacate that portion of the trial court's order directing Karen Milne to reimburse David Milne, IV, the sum of $3,250 per year as her contribution toward Caleb's college

election, to depart from his parent's house, with power to charge that parent with his support, would tend to the destruction of all parental authority, and invert the order of family government. *Id.* at 151–52.

education expenses. Order affirmed in part; vacated in part.

McEWEN, J., files a dissenting opinion.

OLSZEWSKI, BROSKY and POPOVICH, JJ. join McEWEN, J.

McEWEN, Judge, dissenting:

The basic issue [1] in this appeal, which arises from the underlying action for support instituted by appellee, Caleb Milne, against his mother and father, is the effect of estrangement upon the qualified duty of a parent to assist to provide a college education for his or her child. I am compelled to this expression because I share the view of the eminent Montgomery County Common Pleas Court Judge William T. Nicholas that estrangement should not be a bar to an action for such support.

Karen and David Milne were married on April 16, 1962, and separated twenty-two years later in December of 1984. Caleb, the younger of two children born of the marriage, was a high school senior at the time of the separation of his parents, and continued to reside in the marital home with his mother for three months after the separation until, in March, 1985, by reason of the strain in relations between himself and his mother, he left the marital residence to reside in the home of his father. Six months after Caleb commenced to reside in the home of his father, he matriculated at the University of Richmond where he completed his freshman year of college and attained a 3.0 average. His father, appellee David Milne, provided for the payment of all expenses incurred by Caleb during the 1985–1986 academic year, and Caleb continued to reside with his father whenever he was not in residence at the University. Caleb had originally wished to attend Occidental College in California, and when that institution admitted him for completion of his undergraduate studies, he commenced this action

1. An action for divorce was pending at the time of the support hearing.

of support against his mother and father to secure financial assistance in meeting the anticipated second year college expenses of $16,000, a sum far greater than his approximate yearly earnings of $3,000. The hearing court concluded that the estrangement was not a bar to an action for support by the son, and (1) directed Caleb's father, appellee David Milne, to pay Caleb's entire tuition, room, board, and transportation to and from college, and (2) directed Caleb's mother, appellant Karen Milne, to partially reimburse David Milne for such education expenses by remitting to appellee the sum of $62.50 per week ($3250.00 per year). Appellant timely appealed.

The testimony of the parties established that Caleb did not communicate with or visit his mother after moving into the home of his father, and Karen Milne testified that, prior to his departure, her son "spat in my face and shoved me so that I fell over. He never spat but once. He did push me more than once. He struck me at least twice.... It was unpleasant in our house." Thus, there is quite a valid basis for the finding of the hearing court that, sad to relate, the mother and son were estranged.

The principles which guide consideration of this claim by a son for contribution by his mother toward the cost of college study are well established. "The purpose of child support is to promote the best interest of the child; the associated legal obligation of parents is to provide for the reasonable expenses of raising the child." *Sutliff v. Sutliff*, 515 Pa. 393, 402, 528 A.2d 1318, 1322 (1987). The qualified duty of a parent to support a child in college was first delineated by this Court in *Commonwealth ex rel. Ulmer v. Sommerville*, 200 Pa.Super. 640, 190 A.2d 182 (1963):

We believe that the law of this Commonwealth requires a father, under certain circumstances, to support a child while attending college and that this appeal brings squarely before us the question of what circumstances will justify the entry of a support order in favor of such child. In the first place, before the father should be

required by court order to support a child in college, the child should be able and willing to successfully pursue his course of studies. *Commonwealth ex rel. Grossman v. Grossman, supra,* 188 Pa.Super. 236, 241, 146 A.2d 315 (1958). In the second place, the father should have sufficient estate, earning capacity or income to enable him to pay the order without undue hardship.

The duty of a parent to provide a college education for a child is not as exacting a requirement as the duty to provide food, clothing and shelter for a child of tender years unable to support himself. It is a natural law that a parent should spare no personal sacrifice to feed and protect his offspring. Therefore, beyond the barest necessities, a father should be required to sacrifice personal comfort in order to provide the necessities of a child too young to support himself. The same exacting requirement should not be demanded of a father to provide a college education for a child able to support himself. We are not suggesting that a father should be required to support a child in college only when the father's income or estate is such that he could do so without making *any* personal sacrifices. Most parents who send a child to college sacrifice to do so. No mathematical rule can be formulated to determine how extensive the hardship upon a father must be before it will excuse him from supporting a child in college. It must be a matter of judgment in a field where the judgments of sincere and advised men differ materially.

*Commonwealth ex rel. Ulmer v. Sommerville, supra,* 200 Pa.Superior Ct. at 643–44, 190 A.2d at 184 (emphasis in original). *Accord: Emrick v. Emrick,* 445 Pa. 428, 430–431, 284 A.2d 682, 683 (1971); *Leonard v. Leonard,* 353 Pa.Super. 604, 608–609, 510 A.2d 827, 829–830 (1986); *Miller v. Miller,* 269 Pa.Super. 83, 86–87, 409 A.2d 74, 76 (1979). *See also: Chesonis v. Chesonis,* 372 Pa.Super. 113, 115–116, 538 A.2d 1376, 1378 (1988); *Commonwealth ex rel. Stump v. Church,* 333 Pa.Super. 166, 169–171, 481 A.2d 1358, 1360 (1984); *De-Vergilius v. DeVergilius,* 329 Pa.Super. 434, 436, 478 A.2d

866, 868 (1984); *Curtis v. Curtis*, 326 Pa.Super. 40, 43–44, 473 A.2d 597, 599 (1984).

It is, of course, well settled that

[o]n appeal, a trial court's child support order will not be disturbed unless there is insufficient evidence to sustain it or the court abused its discretion in fashioning the award. An abuse of discretion is not " 'merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused.' "

*Fee v. Fee*, 344 Pa.Super. 276, 279, 496 A.2d 793, 794 (1985) *quoting Boni v. Boni*, 302 Pa.Super. 102, 109, 448 A.2d 547, 550 (1982) (citations omitted). *Accord: DeWalt v. DeWalt*, 365 Pa.Super. 280, 283–284, 529 A.2d 508, 510 (1987); *Michael v. Michael*, 360 Pa.Super. 312, 315–316, 520 A.2d 473, 475 (1987); *Leonard v. Leonard, supra* 353 Pa.Super. at 608–609, 510 A.2d at 829; *Commonwealth ex rel. Leider v. Leider*, 335 Pa.Super. 249, 254–256, 484 A.2d 117, 120 (1984); *Straub v. Tyahla*, 274 Pa.Super. 411, 414–415, 418 A.2d 472, 474 (1980).

Appellant initially argues that the hearing court abused its discretion when it held that the estrangement of Caleb and appellant was not a bar to an action for support by Caleb. This Court has previously recognized only two prerequisities to the entry of an order of college support: first, that the child establish a willingness and ability to successfully pursue a college education, and, secondly, that the evidence disclose an earning capacity or income sufficient to enable the parent to provide financial assistance to the child without assuming undue hardship. The question of whether estrangement will preclude an award of support for a child attending college has not, until this decision, been precisely decided by the appellate courts of this Commonwealth,[2] although our Supreme Court has stated, in the

2. This issue was addressed as dicta in *DeWalt v. DeWalt, supra,* 365 Pa.Super. at 287–288, 529 A.2d at 512, and in a concurring opinion in

context of the support for a child under the age of eighteen, that "the amount of time a parent spends with his or her children has no bearing on that parent's obligation of support. Even a parent who never sees his or her children has a duty to support those children to the best of his or her ability." *Melzer v. Witsberger,* 505 Pa. 462, n. 6, 480 A.2d 991, 996 n. 6 (1984).

This Court here squarely confronts the issue and adds a third prerequisite to the entry of an order of college support, namely, evidence that the child, by virtue of the relationship between the child and the parent, is "deserving" of the financial support he or she seeks. I am unable to agree that the present two-tiered test for such support should be expanded to include an inquiry into the parent-child relationship. I would instead, by reason of public policy considerations, hold that the estrangement of parent and child should not of itself, if the child has the ability to pursue college studies and the parent has sufficient resources, relieve the parent of the duty of continuing to contribute to the support of a child pursuing a college education.

This Commonwealth is now numbered among those jurisdictions which permit dissolution of the marriage bond through the process of "no-fault" divorce. The legislature adopted the "no-fault" procedure only after prolonged consideration, and after proclaiming:

§ 102. Legislative findings and intent

(a) The family is the basic unit in society and the protection and preservation of the family is of paramount public concern. Therefore, it is hereby declared to be the policy of the Commonwealth of Pennsylvania to:

(1) Make the law for legal dissolution of marriage effective for dealing with the realities of matrimonial experience.

*Chesonis v. Chesonis, supra* 372 Pa.Super. at 116–117, 538 A.2d at 1378–1379 (Concurring Opinion by Cirillo, P.J.)

(2) Encourage and effect reconciliation and settlement of differences between spouses, especially where children are involved.

(3) Give primary consideration to the welfare of the family rather than the vindication of private rights or the punishment of matrimonial wrongs.

*    *    *    *    *    *

23 Pa.C.S. § 102(a)(1, 2), (3).

As a result, the dissolution of a marriage is permitted without consideration of the events or conduct which may have led to the discord and the divorce, and the focus during the division of assets is the fact that the parties were once partners, rather than the circumstances which severed the partnership. It would seem prudent, as well as consistent, to have the "realities" which inspired the legislature to adopt no-fault procedures for estranged partners to a marriage guide resolution of the instant issue of support.

First, a finding as to the cause of the estrangement between parent and child could only follow an adversarial proceeding into fault, an impossible task for any earthly court since the determination would require a review and evaluation of the dynamics of the family relationship over the years of its existence. As our sister tribunal in Illinois opined in addressing this issue:

... defendant argues that his daughter has refused to have anything to do with him for many years, that the estrangement is the daughter's fault and since she has now reached her majority he ought not to be required to contribute further to her support for any purpose. Being required to contribute to his daughter's educational expenses is characterized by defendant as a 'penalty' which defendant insists he should not be required to sustain for the benefit of an ungrateful daughter.... Defendant has cited no Illinois cases and our research has likewise produced no authorities which have directly applied or discussed the fault of children concept as bearing on the obligation of parents. However to say as a matter of law that the estrangement between child and parent where

there has been matrimonal discord between parents resulting in divorce can be solely the fault of a child is to state a principle difficult to sustain either on reason or logic.... Without deciding which of the parents was responsible for the acrimony it requires no great insight to conclude that the daughter's attitudes and relations with her parents were shaped by many influences beyond her control and were more likely the result of conduct of both parents.

*Hight v. Hight,* 5 Ill.App.3d 991, 993–994, 284 N.E.2d 679, 681 (1972).

Second, application of risk/benefit principles demonstrates that an inquiry into the parent/child relationship would not be purposeful. If, where the parent and child are estranged, an inquiry into fault were to be conducted and a court were to erroneously relieve a parent of the obligation of support, both the child and society would be wrongly deprived of the benefits which a college education would bestow. On the other hand, were the court to err by burdening the parent with the duty to assist an undeserving child, the only damage occasioned thereby would be financial loss to the parent. It is thus apparent that the risk of erroneously depriving a deserving child far outweighs the risk of bestowing such a benefit upon an undeserving child.

Third, a cost/benefit analysis reveals that an inquiry into the basis for the estrangement would, in the long run, prove unwise for the parent, as well as the child. Surely, an adverserial proceeding into fault will serve to cement the bitterness between parent and child, and cause that filial relationship to be all but irretrievable. On the other hand, if the courts were to preclude an inquiry into the nature and depth, as well as responsibility for, the estrangement, the parent is enabled to view financial assistance provided an estranged child as the price of the inner peace that is certain to flow in subsequent years from the knowledge that the parent did not permit the merely material to thwart the possibility of a future reconciliation. This approach but mirrors, of course, the lesson of the ancients that without a

father of unrelenting patience, unfailing forebearance, and unending forgiveness, there could not have been a prodigal son.

Thus it is that I would hold that the estrangement of parent and child should not of itself, if the child has the ability to pursue college studies and the parent has sufficient resources, relieve the parent of the duty of continuing to contribute to the support of a child pursuing a college education.

OLSZEWSKI, BROSKY and POPOVICH, JJ., join.