571 A.2d 1070

**Nancy PHAROAH, Individually and as Guardian for Anthony Lapes, a Minor**

v.

**George A. LAPES, Appellant (Two Cases).**

Superior Court of Pennsylvania.

Argued Sept. 27, 1989.

Filed March 1, 1990.

586

Donald H. Yost, York, for appellant.

Susan A. Docktor, Dillsburg, for appellee.

Before CIRILLO, President Judge, and BECK and JOHNSON, JJ.

BECK, Judge:

Nancy Pharoah (formerly Nancy Lapes and hereinafter "mother"), filed a petition seeking contribution from George Lapes, the father, for the college education and support of their son Anthony. Since 1981 father has been paying child support for Anthony and a younger child Andrea pursuant to a marital settlement agreement. The agreement contemplated college education for both children.[1] Rather than fixing a specified contribution or constructing a formula by which to do so, the agreement acknowledged each party's commitment to the post-secondary education of the children and provided that each party would contribute to that education commensurate with his or her then ability to pay. The agreement also provided that if the parties disagreed about the contribution of each parent, either one of them could seek a judicial resolution of the dispute. Such a dispute arose and mother brought the instant support action. The father appeals the order of the support court.

A brief description of the family background is helpful to an understanding of the issues in the case. Appellant and appellee were divorced in 1981 after a sixteen year marriage. Both parties have remarried. The father lives in York, Pennsylvania with his wife and their young son. He is a psychiatrist earning approximately $200,000 a year. The mother lives in Georgia with Anthony and Andrea and her husband. The mother is a former nurse who left her career in favor of full-time parenting. The children maintain a cordial relationship with their natural father and paternal grandparents through correspondence, telephone

1. In fact, the marital settlement agreement provided for continued support payments by the father until each child reached twenty-three years of age or completed four years of post-high school education. The payments were to be seven and one-half ($7\frac{1}{2}$) percent of the father's gross earned income for each child.

conversations and visits.[2]

The focus of this dispute is Anthony's education. He was an outstanding student in high school. He was valedictorian and graduated number one in his class. He received numerous academic and athletic awards both nationally and at home.[3] He excelled in math, history and languages. His athletic achievements included football, basketball and track. As a result of his remarkable record, Anthony was in the enviable position of having to choose between two universities, Georgia Institute of Technology and Massachusetts Institute of Technology (hereinafter Georgia Tech and M.I.T.). Although Georgia Tech offered him a full tuition scholarship, he chose to attend M.I.T. He had formed an ambition to attend M.I.T. early in his high school career.[4] Anthony explained that he consulted with his parents during the course of high school about his college plans. Since no one raised any objection to his applying to M.I.T., he concluded that cost would not be a "major factor" in deciding whether or not to attend. In addition to being an outstanding institution of higher education, M.I.T. also offered Anthony an opportunity to live in an entirely different geographical area.

The trial judge held a three day hearing at which she heard extensive testimony from Anthony, his father and his

2. The record established that although the children did not see their father very frequently, they were in regular contact. Periodically, Anthony would visit his father and grandparents in York and played golf with his father on those occasions. Appellant attended Anthony's high school graduation and also visited him in college twice. Father accompanied son to his fraternity pinning since he had been a member of the same fraternity. Both father and son testified to telephone calls and letters.

3. Among these awards were: National Honor Society; National Merit Scholar; U.S. Army Reserve National Scholar Athlete Award; 1st Place in Elk's Most Valuable Student Contest; 1st Place in American High School math exam and several other awards in math, history and science.

4. Anthony applied to M.I.T. for financial assistance but was rejected on the basis of his father's income. Although Anthony's college education is being subsidized in part by various awards and scholarships, including a National Merit Scholarship, these were awarded on the basis of merit not need.

mother. During the course of lengthy direct and cross examination Anthony testified to his educational accomplishments and aspirations and the reasons behind his decision to attend M.I.T. He gave a detailed accounting and explanation of his living expenses. Further, he described his relationship with his father. The father and mother were also subject to protracted examination on their financial circumstances. Finally, the mother testified in depth about the expenditures she made in raising her children. Based on the testimony at trial as well as on substantial documentary evidence, the trial court fashioned an order requiring appellant to contribute $1715.00 per month towards Anthony's college support ($20,580.00 per year). The court arrived at this figure after taking into account the numerous merit scholarships Anthony had been awarded and also assessing Anthony's own ability to earn some money to defray his expenses.

On appeal appellant asserts that: 1) the trial court abused its discretion by obligating appellant to pay the additional costs of tuition at M.I.T. because Georgia Tech had offered Anthony a tuition-free education; 2) the trial court abused its discretion in calculating Anthony's reasonable living expenses; and 3) the trial court abused its discretion by underestimating the available income of the mother in determining her share of the college support obligation. For the reasons which follow, we affirm.

It is well established that the scope of appellate review in child support cases is very narrow. The appellate court will disturb a trial court's findings only when the judge has clearly abused his or her discretion. "[A] finding of such abuse is not lightly made and must rest upon a showing of clear and convincing evidence." *Shindel v. Leedom,* 350 Pa.Super. 274, 279, 504 A.2d 353, 355–56 (1986) (citations omitted). What constitutes an abuse of discretion is also well settled. It is not " 'merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown

by the evidence or the record, discretion is abused.' " *Fee v. Fee,* 344 Pa.Super. 276, 496 A.2d 793, 794 (1985) (citation omitted). The scope of review in such cases is not altered by the fact that the order is for college support as opposed to support for a minor child. *See Bedford v. Bedford,* 386 Pa.Super. 349, 563 A.2d 102, 104 (1989); *Leonard v. Leonard,* 353 Pa.Super. 604, 608, 510 A.2d 827, 829 (1986); *Commonwealth ex rel. Larsen v. Larsen,* 211 Pa.Super 30, 234 A.2d 18 (1967). Judged by this stringent standard, we find no abuse of discretion.

■ The obligation of a parent with adequate financial resources to furnish support for a child's college education is well settled in Pennsylvania. *See, e.g., Miller v. Miller,* 353 Pa.Super. 194, 509 A.2d 402 (1986); *Sutliff v. Sutliff,* 339 Pa.Super. 523, 489 A.2d 764 (1985). A court will impose this obligation on a parent only if the burden of college support will not cause undue hardship. *Leonard v. Leonard, supra; Bedford v. Bedford, supra.* Furthermore, if it can be shown that "a parent can meet the support needs of a college-age child with ease, a court is free to impose a complete obligation." *Miller v. Miller, supra,* 509 A.2d at 404. In this regard we note that appellant does not argue that he lacks the financial ability to contribute the ordered amount towards Anthony's college education, nor could he reasonably do so. The trial court found that appellant's annual gross earned income for 1986 and 1987 was $202,-358.00 and $190,756.00 respectively and that his reasonable living expenses were approximately $5000.00 per month.[5] Appellant does not dispute the accuracy of these findings nor does he argue that payment of the court ordered college expenses will work any hardship on him, much less "undue hardship". Rather the gravamen of appellant's argument is that it was "unreasonable" for the court to order him to contribute toward's Anthony's M.I.T. education when Anthony could have received an education elsewhere for less

5. This figure included the child support payments for his daughter, Andrea.

money. Under the circumstances of this case, we find appellant's argument lacks merit.

It is the father's contention that his responsibility is limited to an education that is "proper", "reasonable" or "adequate". Therefore, he argues that since an education at Georgia Tech would have been "adequate", he should not have to pay the added expense of sending Anthony to M.I.T. What appellant overlooks in his reasoning is that here, as in any support matter, what is "reasonable" depends upon an assessment of *all* the circumstances in the case including the intellectual and scholastic achievements and aspirations of the child, the financial resources of the parents, the parties' station in life and customary standard of living and the child's relationship with the parent from whom he seeks support. Moreover, and most importantly, the assessment of what constitutes reasonable support in a given case is left to the sound discretion of the trial court.

The principle that the fashioning of an equitable college support order is a matter best handled by the trial court was emphasized in *Commonwealth ex rel. Larsen v. Larsen, supra,* a case upon which appellant mistakenly relies. At issue in *Larsen* was "the extent to which a father is obliged ... to support a child attending an expensive private college when an adequate but less expensive education is available elsewhere." 234 A.2d at 20. The court in *Larsen* refused to establish an inflexible rule but instead recognized that *"[t]he determination of whether such an additional burden should be imposed on the father is a matter for the trial court". Id.* (emphasis added) Further, this court noted:

> [T]he court must first ascertain what advantages are offered by the more expensive college in relation to the child's individual needs, aptitude, ability, and the child's anticipated vocation. It must then weigh these advantages against the increased hardship that would be imposed on the father to determine whether the additional expense is reasonable under the circumstances. *We realize that a judge who sees and hears the witnesses in a*

*case such as this is in a better position than this Court to decide this problem and our function on appeal, therefore, is merely to determine whether the lower court is chargeable with an abuse of discretion.*

*Id.* at 21. (emphasis added).

In *Larsen,* the father from whom increased college support payments were sought was a medical doctor who had almost reached retirement age, had a modest income, a fraction of appellant's in the instant case and, therefore, there was a risk that the increased payments might jeopardize his financial security. As has already been noted, the same cannot be said for the appellant in this case whose financial assets are undisputedly substantial.[6] More importantly, the child in *Larsen* was an average student and the more expensive college he sought to attend was on a par with the state-run university. In contrast, in the instant case, the record amply supports the trial court's conclusion that Anthony "deserved" the best education possible based upon his considerable academic accomplishments.[7] The record further establishes that Anthony's decision to attend M.I.T. was based on the reasonable conclusion that it would represent a superior educational experience. This conclusion was reached by assessing the school's selectivity, its

6. It would be ironic indeed if Anthony were made ineligible for financial aid from M.I.T. based on his father's significant assets and yet was barred from relying on those same assets in seeking reasonable college support from his father. By awarding college support in this and other similar cases, the court attempts to mitigate the negative economic impact divorce has on children. *See Maurer v. Maurer,* 382 Pa.Super. 468, 555 A.2d 1294, 1297 (1989).

7. In a misguided attempt to rely on this court's recent decision in *Milne v. Milne,* 383 Pa.Super. 177, 556 A.2d 854 (1989), appellant argues that Anthony must "accept the consequences" of his decision to attend M.I.T. by depriving him of his father's support in meeting his expenses there. Appellant's comparison of this case to *Milne* is far-fetched. In *Milne* the adult child had repudiated his mother in an offensive manner and then sought to impose his college costs on her. Here the relationship between the parties was undeniably warm. Moreover, all Anthony can be said to be guilty of is having the highest possible educational goals. The only "lesson" we would teach by accepting appellant's argument would be that a child of divorced parents could not reap the benefits of having achieved outstanding academic success if by doing so it would place any additional burden on the non-custodial parent. We refuse to adopt such an approach.

ratings in college handbooks, its course offerings in Anthony's chosen field of computer science and its national, indeed international reputation. Under these circumstances, we agree with the trial court which balanced all of these factors along with the father's financial resources and found that the father was required to contribute to his son's M.I.T. education.[8]

Appellant's next contention is that the trial court abused its discretion by miscalculating the reasonable living expenses incurred by Anthony at M.I.T. This argument is without merit. The trial court heard ample and detailed testimony from both Anthony and his mother about the amount of money it was necessary for Anthony to spend during his first two years at M.I.T. The record supports the fact that the trial judge tailored the amount of support to Anthony's realistic needs.

As a separate claim of error, appellant contends that the trial court abused its discretion in determining the reasonable annual transportation expenses for Anthony. The record reveals that Anthony kept a 1973 Volkswagon Rabbit at M.I.T. for his use during the school year. Anthony testified that this vehicle belongs to his stepfather and was given to him for his use at school. He also explained that the car "won't make it" on a trip between Boston and Georgia and therefore he leaves it at school to use for short trips and to run errands. Anthony further testified that when he is in Georgia he uses another family car, which other family members also use. Anthony's mother explained that the insurance expense for Anthony covers him

**8.** Appellant apparently regrets that he was not allowed to take advantage of the windfall which perhaps would have been his had his son elected to attend Georgia Tech. As has been noted by a member of this court, parents bear the primary financial responsibility for their childrens' college education and other sources of financial aid are both secondary and limited. Hopefully, if parents who can amply afford to do so meet their financial responsibilities, more resources will be available for those college-bound students who are in genuine need of aid. *See Leonard v. Leonard, supra,* concurring statement by Kelly, J., 510 A.2d at 832. In the instant case, appellant has already had his financial obligation reduced by the numerous scholarships and awards his son was able to obtain by his scholarly efforts.

on any family car he drives. Therefore, the insurance expense is the same whether Anthony has use of one or two cars. She further explained that the gasoline expenditures she listed as a child-rearing expense are incurred by Anthony alone during his school breaks and during summer vacations when he is home working his summer job. Appellant suggests that to allow for the insurance, maintenance, gas and other expenses for these two vehicles was error by the trial court. We disagree.

The reasonable use to which Anthony put these two vehicles was thoroughly explored in the record and the availability of two cars under these circumstances is not inappropriate for a college-age student whose school is a thousand miles from home. Similarly, the record supports the trial court's finding that it was proper to include air transportation between Boston and Georgia at the start and end of the school year and for vacations as a reasonable and necessary living expense. Appellant suggests that it would be more reasonable to expect Anthony to drive to and from Georgia and Massachusetts despite unrefuted testimony from both Anthony and his mother that safety considerations dictate against it. We conclude appellant's allegation of abuse of discretion by the trial court is meritless.

Finally, appellant argues that the trial court failed to calculate correctly the mother's contribution towards Anthony's college education. However, the record does not support this claim. The trial court attributed $20,000.00 of annual earning capacity to the mother although, as a homemaker and full-time parent, she had no actual income. Furthermore, the trial court allocated this entire amount as available to meet Anthony's needs, because the trial court reasoned that the mother's second husband supported her completely.[9] All parties were subject to rigorous scrutiny through direct and cross examination regarding their incomes and expenditures. The trial court fairly assessed

---

9. It is obvious, therefore, that appellant's contention that the trial court failed to consider appellee's husband's contribution to the household is wholly without merit.

both the mother's and father's financial status in determining their respective contributions to Anthony's college education. We find no abuse of discretion in this regard.[10]

Order affirmed.

JOHNSON, J., files concurring opinion.

CIRILLO, President Judge, files dissenting opinion.

JOHNSON, Judge, concurring:

I agree with my colleague, Judge Beck, that the Honorable Sheryl Ann Dorney has not committed any abuse of discretion in fashioning an equitable college support order. Because our scope of review is, quite properly, a narrow one, I am reluctant to join Judge Beck's conclusion that the record before us establishes that attendance at the Massachusetts Institute of Technology (M.I.T.) by Anthony Lapes will result in a "superior educational experience" than if he were to attend the Georgia Institute of Technology (Georgia Tech).

As a reviewing court, we need not independently conclude that Anthony is "deserving" of what he believes to be "the best education possible" in order to affirm the trial court. Where we can confirm that the support award is within the financial means of the parent, which clearly is the case here, and where the trial judge has reasonably applied the principles regarding a parent's obligation for support, our

10. Appellant contends that the trial court should have included in its calculations of the mother's financial assets available for Anthony's education the amount of child support being paid to her for Andrea. He further suggests that the mother failed to exercise proper "stewardship" of her previously received child support monies by failing to save more significant amounts of it for the childrens' college education. We see no support for this contention in the record. On the contrary, the mother's credible testimony indicated that the childrens' expenses consistently exceeded the child support payments and that in addition she still had managed to save $4000.00 and $7000.00 for Anthony's and Andrea's education respectively. Moreover, we see nothing in the separation agreement or in the testimony which would indicate that the parties in any way contemplated that a portion of the child support amounts paid in the childrens' minor years would be set aside to pay for college. In fact, the agreement's college support provision belies this interpretation.

role is complete once we have ruled out an abuse of discretion.

Judge Dorney has carefully applied the law to the facts in this case. I, therefore, agree that the order of August 5, 1988 must be affirmed.

CIRILLO, President Judge, dissenting:

Because I feel that under the circumstances of this case George A. Lapes ("father") should not be forced to finance his son Anthony's education at the Massachusetts Institute of Technology ("MIT"), I must respectfully dissent.

As the majority notes, Anthony was in the enviable position of having to decide between attending MIT or Georgia Institute of Technology ("Georgia Tech"). Confronted with this decision, Anthony consulted a number of people, including his father. During this brief consultation, Anthony informed his father that he was considering attending MIT, and since his father did not object to the cost of MIT, Anthony concluded that cost was not a major factor. What Anthony did not convey to his father was that Georgia Tech had offered him a full tuition scholarship. Anthony ultimately chose to attend MIT and the instant dispute arose.

The basic test for fashioning an award of support for post-secondary education is well settled:

> An award made after majority for contribution to college expenses is made within the discretion of the court. This exercise of discretion is bounded by a judicially promulgated test consisting of two factors: the desire and ability of the child to successfully pursue post-secondary education and the ability of the parents to contribute to that effort without undue hardship.

*Milne v. Milne*, 383 Pa.Super. 177, 556 A.2d 854, 858 (1989) (citations omitted). The above elements do not exist in a vacuum; when determining an award for college expenses it is necessary for the trial court to weigh and evaluate a number of factors peculiar to each case which are outside

the confines of the two tier test. *Id.* There are myriad cases that have considered factors outside the narrow two tier test when fashioning support awards for college expenses. *Id.*[1] Further, although a college education is increasingly being viewed as a necessity, the duty to support a college-bound student in his or her majority is a qualified one. *Id.* Additionally, "we do not believe that the child should have absolute discretion in selecting a college, and thereby unilaterally increasing the father's support obligation." *Commonwealth ex rel. Larsen v. Larsen,* 211 Pa.Super. 30, 33, 234 A.2d 18, 20 (1967).

Instantly, it is undisputed that Anthony has the ability and desire to attend MIT. Moreover, the father does not contest his ability to finance Anthony's education. The father does, however, argue that he should not be financially responsible for Anthony's unilateral decision to attend MIT when Anthony did not discuss the cost of college with him, and more significantly, withheld from the father the fact that he was offered a four-year full tuition scholarship at Georgia Tech.[2] If we were confined to the two tier test, our discussion would be at an end since Anthony has the academic proficiency to attend MIT and the father has the financial ability to contribute to that effort without undue hardship. *Milne, supra.* I refuse, however, to blindly apply this two part analysis.

[1] For example, in *Milne,* this court looked outside the two tier test and held that an adult child's willful estrangement from his or her parent excuses that parent from his or her duty to contribute to the child's educational expenses. In *Bedford v. Bedford,* 386 Pa.Super. 349, 563 A.2d 102 (1989), we clarified the estrangement necessary to cut off a parent's duty to contribute to support of the child's college expenses. *See also Sutliff v. Sutliff,* 515 Pa. 393, 403, 528 A.2d 1318, 1322 (1987); *Melzer v. Witsberger,* 505 Pa. 462, 480 A.2d 991 (1984); *Chesonis v. Chesonis,* 372 Pa.Super. 113, 538 A.2d 1376 (1988); *DeWalt v. DeWalt,* 365 Pa.Super. 280, 529 A.2d 508 (1987); *Francis v. Francis,* 358 Pa.Super. 391, 517 A.2d 997 (1986); *DeVergilius v. DeVergilius,* 329 Pa.Super. 434, 478 A.2d 866 (1984); *Commonwealth ex rel. Smith v. Smith,* 217 Pa.Super. 1, 268 A.2d 161 (1970); *Commonwealth ex rel. O'Hey v. McCurdy,* 199 Pa.Super. 115, 184 A.2d 291 (1962).

[2] Although the father has not contested his ability to pay, it is not inconceivable that the cost of a MIT education may work an undue hardship even upon a parent who has annual earnings of approximately $200,000.00.

Initially, it is worth noting that Anthony should be lauded for his academic achievements, and ideally he should be afforded the best education possible based upon these achievements. Our function, however, is not to compel divorced parents to provide the ideal support for their children, rather we only require them to furnish reasonable support. As the majority correctly states, what is an adequate and reasonable support order depends upon an assessment of all the circumstances in a particular case. The inadequacy in the majority's analysis is that it does not assess the totality of the circumstances with the goal of replicating, as nearly as possible, the decision the intact family would have made. *Milne*, 383 Pa.Super. at 184, 187, 556 A.2d at 859, 861; *see also* Horan, *Postminority Support for College Education–A Legally Enforceable Obligation in Divorce Proceedings?* 20 Fam.L.Q. 589, 607 (1987) (hereinafter *Horan* ).[3]

Courts are traditionally, and for good reason, reluctant to cross the threshold of the family dwelling, for so far as they venture beyond that threshold, they have intruded.... The view that courts should not interfere in family relations is a fine approach, unless by taking it, the court allows greater evil than that which it attempts to prevent.

*The objective of the court [in] extending its protection to adult children of divorced parents is to ensure that they are not unjustly deprived of opportunities they would otherwise have had, had their parents not divorced. The role of the courts in this endeavor should be one of substituting its judgment, as nearly as possible,*

---

**3.** "The goal of postminority support is not to make wholesale awards of college tuition, but to replicate, as closely as possible the decision the intact family would make." *Horan,* 20 Fam.L.Q. at 607. "In essence, by carefully evaluating the most salient factors comprising the family's total circumstances, the court [*Hardisty v. Hardisty,* 183 Conn. 253, 439 A.2d 307 (1981)] attempted to identify the approach which the parties themselves would have taken to educate their child had their marriage not been terminated." *Note, Support Obligations of the Non–Custodial Parent for Private Secondary and College Education: Toward a Uniform and Equitable Resolution,* 16 Suffolk U.L. Rev. 755, 767 (1982) (hereinafter *Parental Support Obligations* ).

*for that of the parents.* But this should not be done mechanically or arbitrarily. In essence, the court stands in loco parentis in making such decisions. For that reason, we must put ourselves in the shoes of each parent whose case comes before us. ... *it is incumbent upon our judiciary to fashion each decision with the best interests of the whole family in mind.*

*Milne,* 383 Pa.Super. at 186–87, 556 A.2d at 859–860 (footnotes omitted, emphasis added). Essentially, the court is required to assume the responsibility of an intact family. *Milne,* 383 Pa.Super. at 188, 556 A.2d at 861. When a family is intact, there is a discussion of the financial ramifications of an adult child's educational preference. *Milne,* 383 Pa.Super. at 187, 556 A.2d at 860. If an intact family decides, for whatever reason, that they will not bear the burden of sending the adult child to the preferred, albeit more expensive, institution and that child still desires to attend college, he or she is confronted with two alternatives. The child can attend the more costly institution and finance the education on his or her own, or the child can defer to the parents' decision and enroll in the less expensive college with their financial assistance. What the child of the intact family cannot do is attend the more costly college and subsequently sue his or her parents for the resulting expenses.

When the parents divorce, the mutual discussion of significant family matters may not take place. Often, the non-custodial parent who sees the child only periodically has little input on important decisions. As a result of the divorce and the breakdown of the once-intact family unit with its inherent channels of communication, the welfare of the children becomes the responsibility of the courts. *Id.* Our goal, as we are called upon to "usurp the natural functions of the family unit[,] ... [is to] assume the responsibility for the decisions that would be normally made entirely internally in a family if it were still intact." *Milne,* 383 Pa.Super. at 189, 556 A.2d at 860–861.

I remain mindful that, "[a]ll too often what parents would have done willingly had their relationship not deteriorated must, after the fact, be coerced for the benefit of their children." *Chesonis*, 372 Pa.Super. at 117, 538 A.2d at 1379 (Cirillo, P.J., dissenting). More importantly, however, I remain focused on our primary objective which initially prompted courts to interfere in a divorced family's relationships: to ensure that children of divorced parents are not unjustly deprived of opportunities they would have had if their parents had remained married. *Milne*, 383 Pa.Super. at 186–87, 556 A.2d at 859. Conversely, our aim has never been to permit the adult children of divorced parents to reap profits that they would not have enjoyed if the family were still intact.

In the instant case, the majority notes that the relationship between father and son was "undeniably warm." Consequently, the father appeared to hold no animosity for Anthony and had no motivation to act vindictively by summarily rejecting Anthony's decision to attend MIT. When Anthony briefly consulted his father concerning his educational choices he did not inform his father that Georgia Tech had offered him a full tuition scholarship. The father did not discover that Anthony had been offered a full tuition scholarship until these proceedings were initiated. Apparently, the father objected to the cost of MIT before he was aware of the scholarship opportunity presented at Georgia Tech. Further, when one factors the tuition scholarship into the decision, the price of MIT becomes approximately $12,000.00 more than the cost of Georgia Tech, a financial discrepancy that may warrant even the most munificent of parents to refuse to finance a MIT education.[4]

If Anthony's family were intact, there would have been a mutual discussion of Anthony's educational opportunities.

---

**4.** The majority notes that parents who can afford to meet their financial obligations should, so that more resources would be available for those who genuinely need financial assistance. However, the pool of financial resources for the truly needy is equally drained when the intact family, although capable, decides not to finance their child's college education, as when capable divorced parents arrive at this same decision.

Here, Anthony did not notify his father that Georgia Tech had offered him a full tuition scholarship; instead he gave his father incomplete information expecting complete financial support. "We strongly believe that children should discuss their post-secondary educational plans with their parents if they desire the parent to contribute toward that goal." *Bedford*, 386 Pa.Super. at 358 n. 8, 563 A.2d at 106 n. 8. A vital part of any discussion concerning college education in a time of skyrocketing tuitions necessarily involves a consideration of the relative costs of the institutions.

I do not condone or condemn Mr. Lapes' reluctance to pay for a MIT education. I do believe, however, that he would have arrived at this decision even if he and Anthony's mother were not divorced. I reach this conclusion based primarily upon two factors: 1) the father's relationship with Anthony was warm, and there is no evidence that he harbored any animosity toward Anthony, either before or after Anthony's decision to attend MIT, and 2) although it was understood that Anthony would attend college, the father had objected to the high cost of a MIT education even before he discovered that Anthony had been offered a full tuition scholarship to Georgia Tech.

The father's decision not to finance Anthony's MIT education seems to have been purely an economic one, not done out of spite or bitterness. Therefore, under the circumstances of this case, we are not called upon to coerce a father to do something that he would have done willingly "but for" the deterioration of his marital relationship. *Chesonis*, 372 Pa.Super. at 113, 538 A.2d at 1379 (Cirillo, P.J., dissenting); *see also Parental Support Obligations*, 16 Suffolk U.L.Rev. 755, 771. On the contrary, what we are asked to do, and what the majority does, is bestow upon Anthony, at the expense of his father, a benefit he would not have been afforded if his parents had remained married. Accordingly, I respectfully dissent.