591 A.2d 723

**Mary Jo SPITZER, Appellee,**

v.

**Francis J. TUCKER, Appellant.**

Superior Court of Pennsylvania.

Argued Jan. 31, 1991.

Filed May 21, 1991.

540

William J.C. O'Donnell, Paoli, for appellant.

Mark C. Morrow, Philadelphia, for appellee.

Before CAVANAUGH, CIRILLO and BROSKY, JJ.

CAVANAUGH, Judge:

The present appeal is from a support order following a petition initiated by appellee, Mary Jo Spitzer, against her ex-husband, Francis J. Tucker, to obtain from Tucker additional support in order to fund his son Will's educational expenses at Syracuse University. After extensive hearings before a master which took place at three separate sessions held between June and October of 1989, the court entered

an order in June of 1990 which found that each parent had sufficient resources to allow for payment of the educational expenses and that each, after consideration of personal living expenses, had sufficient discretionary income available for this purpose. After ordering the payment of a modest contribution by the student, the court directed that each parent contribute one-half of the tuition, board and related expenses.

Appellant Tucker attacks this order and argues that undue discretion was vested in the student's choice of school and that the court failed to properly weigh the relevant factors; that the court erred in refusing to assign a sufficient earning capacity to the student's mother; and the court failed to properly apply the *"Meltzer"* formula.

A panel of this court recently had occasion to restate the law applicable to our present review:

> It is well established that the scope of appellate review in child support cases is very narrow. The appellate court will disturb a trial court's findings only when the judge has clearly abused his or her discretion. "[A] finding of such abuse is not lightly made and must rest upon a showing of clear and convincing evidence." *Shindel v. Leedom*, 350 Pa.Super. 274, 279, 504 A.2d 353, 355–56 (1986) (citations omitted). What constitutes an abuse of discretion is also well settled. It is not "merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused." *Fee v. Fee*, 344 Pa.Super. 276, 496 A.2d 793, 794 (1985) (citation omitted). The scope of review in such cases is not altered by the fact that the order is for college support as opposed to support for a minor child. *See Bedford v. Bedford*, 386 Pa.Super. 349, 563 A.2d 102, 104 (1989); *Leonard v. Leonard*, 353 Pa.Super. 604, 608, 510 A.2d 827, 829 (1986); *Commonwealth ex rel. Larsen v. Larsen*, 211

Pa.Super. 30, 234 A.2d 18 (1967). Judged by this stringent standard, we find no abuse of discretion.

The obligation of a parent with adequate financial resources to furnish support for a child's college education is well settled in Pennsylvania. *See e.g., Miller v. Miller*, 353 Pa.Super. 194, 509 A.2d 402 (1986); *Sutliff v. Sutliff,* 339 Pa.Super. 523, 489 A.2d 764 (1985). A court will impose this obligation on a parent only if the burden of college support will not cause undue hardship. *Leonard v. Leonard, supra; Bedford v. Bedford, supra.* Furthermore, if it can be shown that "a parent can meet the support needs of a college-age child with ease, a court is free to impose a complete obligation." *Miller v. Miller, supra,* 509 A.2d at 404.

*Pharoah v. Lapes,* 391 Pa.Super. 585, 571 A.2d 1070, 1072–3 (1990).

 We have considered the testimony before the master, the trial court's opinion, the briefs of the parties, and the oral argument presented to this court. From the narrow confines of our posture of review, we find that the arguments of appellant are without merit and we affirm the order of the trial court. We believe that the goal of the court in higher education support cases should be to "replicate, as nearly as possible the decision the intact family would have made" (*See Pharoah, supra,* Cirillo, J. dissenting, 571 A.2d at 1077; *Milne v. Milne,* 383 Pa.Super. 177, 187, 556 A.2d 854, 861 (1989). In such a situation one would expect, for example, that a father who was only subject to minimal support obligations for almost eighteen years would have made economic preparations to assist in his only son's post-secondary education; that a well-educated parent would not resort to a claim of entry level employment competence, or shield personal trust resources to resist what should ordinarily be considered a paramount family aspiration; and finally, that the prospective student would recognize the enormous variety of excellent educational institutions available and yield in his personal preferences to choices dictated by familial resources and wisdom.

Nevertheless, the trial court here was faced to some extent with a *fait accompli*, and fixed positions by the parties. Thus, there is substantial evidence that both parents can make equal contributions to the educational enterprise without undue hardship and there is no necessity for a circumscribed evaluation of Mrs. Spitzer's earning capacity. Moreover, the record supports the trial court's conclusion with respect to this issue, and we find the court's reasoning and disposition to be a valid exercise of discretion.

■ Finally, since the post-secondary support obligation is governed by specific caselaw in Pennsylvania, we see no reason for application of the precise requirements of the *Meltzer* formula.

Order affirmed.

CIRILLO, J., files a dissenting opinion.

CIRILLO, Judge, dissenting.

Because I feel that Francis J. Tucker should not be required to contribute to his son's education at Syracuse University, I respectfully dissent.

Mr. Tucker and Mary Jo Spitzer were divorced in 1973. Mr. Tucker, pursuant to a support order entered in Chester County, was providing $40.00 per week for the support of his son Will Tucker. On January 31, 1989, Ms. Spitzer filed a petition seeking financial contributions from Mr. Tucker for Will's college expenses. Three days of hearings were held and a recommended order was entered to which both parties filed exceptions. The trial court found that Mr. Tucker, an attorney, earns approximately $60,000.00 annually, while Ms. Spitzer, who is the beneficiary of a trust fund and who is a certified teacher, was assigned an earning capacity of $40,000.00 per year.[1] Following oral argument, the Honorable Thomas J. Gavin ordered, in pertinent part, that Will would be responsible for the first $2,000.00 of his college expenses and that the remaining expense

---

1. Ms. Spitzer's current husband is an attorney with gross annual earnings of over $200,000.00.

would be borne equally by both parties. This timely appeal followed.

On appeal, father argues, among other things, that he should not be required to contribute to the cost of Will's Syracuse education because Will's college selection was arbitrary and because Will could receive a comparable education at the Pennsylvania State University ("PSU") for less than half the cost of Syracuse.[2] I agree.

We are once again asked to determine whether the trial court abused its discretion in determining a support award. Although the instant case concerns the support of an adult child, it is instructive to examine the social and moral realities which require court intervention in a divorced family's relationships. It is well settled that the duty to support a minor child is virtually absolute. *Sutliff v. Sutliff*, 339 Pa.Super. 523, 537, 489 A.2d 764, 771 (1985), *modified on appeal*, 515 Pa. 393, 528 A.2d 1318 (1987). While courts and legislatures have only recently concerned themselves with child support obligations, *see* Krause, *Child Support Reassessed: Limits of Private Responsibility and the Public Interest*, 6 Fam.L.Q. 1, 6 (1990) (hereinafter *Krause*), as early as 1765, Blackstone aptly summarized the rationale for such obligations:

> The duty of parents to provide for the maintenance of their children, is a principle of natural law.... By begetting them, therefore, they have entered into a voluntary obligation, to endeavour, as far as in them lies, that the life which they have bestowed shall be supported and preserved. And thus the children will have a perfect right of receiving maintenance from their parents.

**2.** Father also contends that the trial court erred by not assigning a greater earning capacity to mother who is a certified teacher, and that the trial court abused its discretion in failing to perform an on-the-record *Melzer* calculation. *See Melzer v. Witsberger*, 505 Pa. 462, 480 A.2d 991 (1984). Since it is fairly clear that both mother and father have sufficient funds to contribute to their son's education, I will limit my discussion to the propriety of the trial court's decision requiring father to contribute to Will's education at Syracuse.

1 W. Blackstone, Commentaries on the Laws of England 447–448 (1765). Maintenance in 1765, however, did not extend far beyond food, clothing and shelter. Traditionally, such economic support was premised upon reciprocity. *Krause*, at 18. Specifically, support received by the young child morally and legally obligated the adult child to support the aged parent. *Id.* Prior to the advent of Social Security, child support was an investment the supporting parent made to be recovered in later years. *Id.*

Instantly, Will has requested his father to contribute to his college education. While a college education is increasingly viewed as a necessity, the obligation to support a college student is a qualified one. *Milne v. Milne*, 383 Pa.Super. 177, 183, 556 A.2d 854, 858 (1989). The basic test for fashioning an award of support for post-secondary education is well settled:

> An award made after majority for contribution to college expenses is made within the discretion of the court. This exercise of discretion is bounded by a judicially promulgated test consisting of two factors: the desire and ability of the child to successfully pursue post-secondary education and the ability of the parent to contribute to that effort without undue hardship.

*Id.* (citations omitted). The above elements do not exist in a vacuum; when determining an award for college support the trial court is required to weigh and evaluate a number of factors peculiar to each case which are outside the two tier test. *Id.; see also Pharoah v. Lapes*, 391 Pa.Super. 585, 596, 571 A.2d 1070, 1076 (1990) (Cirillo, P.J., dissenting). Numerous cases have considered factors outside the narrow two tier test when fashioning support awards for college expenses. *Id.*[3]

**3.** In *Milne,* this court looked outside the above test and held that an adult child's willful estrangement from his or her parent excuses that parent from his or her duty to contribute to the child's educational expenses. *Milne, supra. See Bedford v. Bedford,* 386 Pa.Super. 349, 563 A.2d 102 (1989) (clarifying estrangement necessary to sever a parent's duty to contribute to the child's college support); *see also Sutliff v. Sutliff,* 515 Pa. 393, 528 A.2d 1318 (1987); *Melzer v. Witsber-*

Here, it is clear that Will has the ability and desire to attend college. Further, although father may wish to persuade us to the contrary, it is apparent from the record that he can afford to contribute to his son's education at Syracuse without *undue* hardship. Thus, if we were limited to the constraints of the above two prong test, our inquiry would cease. I, however, refuse to blindly apply this two part analysis. *Pharoah*, 391 Pa.Super. at 596, 571 A.2d at 1076 (Cirillo, P.J., dissenting). Consequently, while father is able to provide support for a Syracuse education, the question remains whether the trial court, under the present circumstances, abused its discretion in ordering him to do so. "An abuse of discretion is more than an error of judgment. It must be a misapplication of the law or an unreasonable exercise of judgment." *Marshall v. Ross*, 373 Pa.Super. 235, 238, 540 A.2d 954, 956 (1989).

It is undisputed that the amount of any support award depends upon the facts and circumstances of each case. *Pharoah, supra*. Nonetheless, it is helpful to review two previous cases where the child's choice of a more expensive college was opposed by the noncustodial parent. In *Commonwealth ex rel. Larsen v. Larsen*, 211 Pa.Super. 30, 234 A.2d 18 (1967), James Larsen enrolled at Washington and Jefferson College in Washington, Pennsylvania where his tuition and other expenses totaled approximately $3,600.00 per year. James' mother sought to have James' father, Dr. E. Noer Larsen, provide increased support to cover James' college expense. Dr. Larsen claimed that James could receive an adequate, if not superior education, at PSU for a cost of only of $1,275.00 per year. The trial court agreed with Dr. Larsen and this court affirmed.

ger, 505 Pa. 462, 480 A.2d 991 (1984); *Chesonis v. Chesonis*, 372 Pa.Super. 113, 538 A.2d 1376 (1988); *DeWalt v. DeWalt*, 365 Pa.Super. 280, 529 A.2d 508 (1987); *Francis v. Francis*, 358 Pa.Super. 391, 517 A.2d 997 (1986); *DeVergilius v. DeVergilius*, 329 Pa.Super. 434, 478 A.2d 866 (1984); *Commonwealth ex rel. Smith v. Smith*, 217 Pa.Super. 1, 268 A.2d 161 (1970); *Commonwealth ex rel. O'Hey v. McCurdy*, 199 Pa.Super. 115, 184 A.2d 291 (1962).

In what remains a considered insight into this difficult area, the *Larsen* court stated:

> We are reluctant to formulate a rule which would, in all cases, prevent a child from attending the college of his [or her] choice simply because it is more expensive than the state-supported university. On the other hand, we do not believe that the child should have absolute discretion in selecting a college, and thereby unilaterally increasing the father's [or mother's] support obligation.
>
> &#42; &#42; &#42; &#42; &#42; &#42;
>
> The duty of a parent to provide a college education for a child is not as exacting a requirement as the duty to provide food, clothing and shelter for a child of tender years unable to support himself.... No mathematical rule can be formulated to determine how extensive the hardship upon a father must be before it will excuse him from supporting a child in college. It must be a matter of judgment in a field where the judgments of sincere and advised men differ materially.... To determine whether the order is justified, an important consideration is the estate, the earning capacity and the income of the defendant. This, however, is not the sole criterion. There are other circumstances to be considered.

*Id.*, 211 Pa.Superior Ct. at 34, 234 A.2d at 20 (citations omitted) (quoting *Commonwealth ex rel. Ulmer v. Sommerville*, 200 Pa.Super. 640, 644–645, 190 A.2d 182, 184 (1963)). The court in *Larsen* was faced with determining whether the father should be required to fund an expensive private education at Washington and Jefferson, or a less expensive, yet adequate education, at PSU:

> Thus, in a case such as this, the court must first ascertain what advantages are offered by the more expensive college in relation to the child's individual needs, aptitude, ability, and the child's anticipated vocation. It must then weigh these advantages against the increased hardship that would be imposed on the father to determine whether the additional expense is reasonable under the circumstances. We realize that a judge who sees and hears the

witnesses in a case such as this is in a better position that this Court to decide this problem and our function on appeal, therefore, is merely to determine whether the lower court is chargeable with an abuse of discretion.

*Id.* (citations omitted). James' choice of Washington and Jefferson was a unilateral decision, made without consultation with his father. *Id.,* 211 Pa.Superior Ct. at 35, 234 A.2d at 21. James' selection was apparently based upon the fact that Washington and Jefferson offered the advantages of smaller classes and closer contact between students and their instructors. *Id.* Neither the trial court nor this court felt that James' reasons for choosing Washington and Jefferson justified the increased financial burden to his father who was 67 years old at the time. *Id.*

In *Pharoah,* Anthony Lapes decided to attend Massachusetts Institute of Technology ("MIT") instead of accepting a full tuition scholarship to Georgia Institute of Technology ("Georgia Tech"). Anthony had discussed attending college with his father, but neglected to tell him that he had been offered a full tuition scholarship at Georgia Tech. Judge Beck, writing for the court, stated that

the record amply supports the trial court's conclusion that Anthony "deserved" the best education possible based upon his considerable academic accomplishments. The record further established that Anthony's decision to attend M.I.T. was based upon the reasonable conclusion that it would represent a superior educational experience. This conclusion was reached by assessing the school's selectivity, its ratings in college handbooks, its course offerings in Anthony's chosen field of computer science and its national, indeed international reputation.

*Id.,* 391 Pa.Superior Ct. at 592–93, 571 A.2d at 1074. I dissented in *Pharoah* because the majority's decision did not assess the totality of the circumstances with the goal of replicating, as nearly as possible, the decision the intact family would have made. *Id.,* 391 Pa.Superior Ct. at 597, 571 A.2d at 1077 (Cirillo, P.J., dissenting). It is clear, however, that in *Pharoah* Anthony's decision to attend MIT was reached after a studied consideration of its curriculum,

its global reputation and its strong computer science program. *Id.*

In light of *Pharoah* and *Larsen,* it is imperative that we examine the reasons underlying Will's decision to attend Syracuse and whether there is any evidence of record which would indicate that Syracuse would offer Will a superior education. Initially, it should be noted that Will *did* involve his father in the college selection process. Will also testified that he was aware that, due to cost, his father preferred that Will attend PSU. Although Mr. Tucker was consulted, his expressed preference that Will attend PSU was ultimately ignored and Will decided to enroll at Syracuse.

At the hearing, Will did not give any reason why he chose Syracuse over PSU. Will's mother, however, testified that Will simply did not like PSU. Will's mother also opined that Will might not have wanted to attend PSU because his father had, in effect, "pulled some strings," to get Will into the main campus. Ms. Spitzer stated that Will was very proud and did not want to attend a college unless he "got himself in the door."

Will's mother also testified that Will decided to attend Syracuse after he did not gain admission to Richmond or Dickinson. Ms. Spitzer stated that Will liked Syracuse because his best friend from Conestoga was going to attend Syracuse and because Will was interested in watching Syracuse sporting events. Apparently, the academic curriculum at Syracuse was not a factor in Will's decision. Essentially, since there was no indication that Syracuse offered Will a superior education, there was no academic reason for Will to attend Syracuse over PSU.

Moreover, if Will's biological family had remained intact, I do not feel that Will would have had been afforded a Syracuse education. *See* Horan, *Postminority Support for College Education—A Legally Enforceable Obligation in Divorce Proceedings?* 20 Fam.L.Q. 589, 607 (1987) (hereinafter *Horan* ). When a family is intact, there is a discussion of the financial ramifications of an adult child's edu-

cational preference. *Milne*, 383 Pa.Super. at 187, 556 A.2d at 860; *Pharoah, supra* (Cirillo, P.J., dissenting). More importantly, when it is time for an adult child to attend college, the expressed preference of the payor spouse in an intact family is not casually disregarded.

> If an intact family decides, for whatever reason, that they will not bear the burden of sending the adult child to the preferred, albeit more expensive, institution and that child still desires to attend college, he or she is confronted with two alternatives. The child can attend the more costly institution and finance the education on his or her own, or the child can defer to the parents' decision and enroll in the less expensive college with their financial assistance. What the child of the intact family cannot do is attend the more costly college and subsequently sue his or her parents for the resulting expenses.

*Pharoah*, 391 Pa.Super. at 599, 571 A.2d at 1077–1078 (Cirillo, P.J., dissenting). Here, Will and his father did discuss the financial ramifications of attending Syracuse. However, because Will's parents are divorced, he was able to attend Syracuse, against his father's wishes, and sue his father for half of the increased expense. This is both painful and ludicrous.

While the courts require divorced parents to provide support that is reasonable under all the circumstances, married parents do not legally owe their children a lifestyle that is consistent with their income and station in life. *Krause*, at 20. Married parents may rear their children in any reasonable way they see fit. *See id.* When parents divorce, all too often, the noncustodial parent has little input on important decisions. *Pharoah*, 391 Pa.Super. at 599, 571 A.2d at 1078 (Cirillo, P.J., dissenting). As such, the decision-making power is exercised by the custodial parent, who often is not the paying parent. *Krause*, at p. 20.[4]

---

4. Today, fathers increasingly assume an active role in the ongoing family. In stark contrast, the typical custody adjudication in divorce terminates the father's parental status, at least in any meaningful sense. This de facto termination of parental status comes at the very time we impose on the absent parent a child support obligation

I, however, am also aware that what parents would have done willingly had their relationship not deteriorated must, in certain cases, be coerced for the benefit of their children. *Chesonis*, 372 Pa.Super. at 117, 538 A.2d at 1379 (Cirillo, P.J., dissenting). Nonetheless, I have not lost sight of our primary objective which prompted court involvement in a divorced family's relationship:

> to ensure that children of divorced parents are not unjustly deprived of opportunities they would have had if their parents had remained married. *Milne*, 383 Pa.Super. at 186–187, 556 A.2d at 859. Conversely, our aim has never been to permit the adult children of divorced parents to reap profits that they would not have enjoyed if the family were still intact.

*Pharoah*, 391 Pa.Super. at 600, 571 A.2d at 1078 (Cirillo, P.J., dissenting).

Here, Will, against his father's clear wishes, decided to attend Syracuse because his best friend intended to enroll at Syracuse and because he enjoyed watching Syracuse sporting events. These reasons are woefully inadequate to justify the increased support contribution a Syracuse education requires. Unlike the college-bound young adults in *Pharoah* and *Larsen*, there was no testimony that Will's needs would be better served at Syracuse than at PSU. Additionally, there was no indication that Will wanted to take advantage of a specific program that was offered at Syracuse and was not offered at PSU. The court in *Larsen*, while finding that the trial judge is in far better position to make these difficult determinations, stated that a trial judge *"must* first ascertain what advantages are offered by the more expensive college in relation to the child's individual needs, aptitude, ability, and the child's anticipated vocation." *Larsen*, 211 Pa.Super. at 34, 234

that typically is far larger than what he might have shouldered, or was legally obligated to provide, in the ongoing family.

*Krause*, at p. 19 (footnotes omitted). Although Mr. Tucker's child support payments for Will were arguably reasonable, the above comments become relevant to the instant case in light of the increased college support contribution now required of Mr. Tucker.

A.2d at 20 (emphasis added). After such a determination is made, then the trial judge must weigh these advantages against the increased hardship that would be imposed upon the payor to decide if the additional expense is reasonable under the circumstances. *Id.* Here, other than the presence of Will's best friend on campus, the record reveals no advantage that is inherent in a Syracuse education and lacking in an PSU education. Consequently, since Syracuse offered no such advantages, the increased expenditure cannot be justified.

There was testimony at the hearing that Will's father lived a frugal life. Clearly, cost, as Ms. Spitzer admitted, has always been a factor for Mr. Tucker. Moreover, there was no indication that Will harbored any animosity for his father; indeed, Will worked for his father during the summers of 1988 and 1989. These two factors, Mr. Tucker's frugality and the apparently friendly relationship between father and son, lead me to conclude that Mr. Tucker would not have agreed to fund Will's Syracuse education if the family had remained intact. On the contrary, from the testimony it appears that Mr. Tucker would have insisted that, for financial reasons, Will attend PSU.

I do not condone or condemn Mr. Tucker's reluctance to finance a Syracuse education. The evidence revealed that at the date of the hearing a year at Syracuse cost approximately $15,000.00, an education that even the most munificent of parents may decline to fund.

I cannot close without commenting upon the current cost of post-secondary education and its resulting effect on divorced parents. Between 1980 and 1986 the average cost to attend a private university rose by % 80.8, the cost to attend a public university rose by % 61.2, yet the median family income rose only % 40.1. *New York Times*, March 23, 1988 at B8 col. 1. Experts agree that education costs will continue to increase.[5] In light of the exorbitant cost of

5. For a child born in 1988, four years at a public university is estimated to cost $120,000.00 in tuition and other expenses. *New York Times*, Feb. 20, 1988, at 34, col. 1.

attending college, we should not require increased support contributions from divorced, yet financially capable, parents without legitimate reasons to justify the augmented expenditure. *See Larsen, supra.* Surely, although a college education is arguably a necessity, no one can argue that Will *needs* a Syracuse education. As such, our task is to make certain that Will receives an education that is reasonable under all the circumstances. A careful review of the instant circumstances make it painfully clear that requiring Mr. Tucker to contribute to the support of a Syracuse education because of the proximity of Will's best friend and a preference for watching Syracuse athletics is undoubtedly unreasonable.

In sum, because Will offered no academically legitimate reason for attending Syracuse instead of PSU and because Mr. Tucker's history of frugality convinced me that he would have been opposed to funding a Syracuse education if the family had remained intact, I find that, pursuant to *Larsen*, the trial court abused its discretion when it ordered Mr. Tucker to contribute to Will's educational pursuits at Syracuse when Will could have enjoyed a comparable education at PSU for less than half the cost.