581 A.2d 177

**Thomas TROSKY and Children's Home of Reading, For and on Behalf of Todd R. Mann, Appellee,**

v.

**James I. MANN, Appellant.**

Superior Court of Pennsylvania.

Argued June 12, 1990.

Filed Sept. 26, 1990.

Malcolm J. Gross, Allentown, for appellant.

Michele A. Varricchio, Allentown, for appellee.

Before BECK, POPOVICH and HESTER, JJ.

POPOVICH, Judge:

This case involves an appeal from the order of the Court of Common Pleas of Lehigh County directing that support payments in the amount of $650.00 per month, retroactive to a date specified, be paid to the Children's Home of Reading by the appellant/defendant, James I. Mann, for that period of time his adopted child was in its care and custody. We affirm.

The facts, as garnered from the October 5, 1989, support hearing, disclose that James and Faye Mann are the adoptive parents of Todd, a 16–year–old youth whose emancipation status is the object of inquiry for support purposes.

James I. Mann testified that since the 1st of December, 1978 (which was just prior to Todd's fifth birthday) the youngster had caused nothing but problems for the Manns. For example, at the end of September, 1987, Todd removed the family vehicle from the garage, without authorization and while the Manns had taken one of their other sons to college, and caused $6,000.00 in damages. Todd also had been fraudulently securing refunds from various companies

under the guise of complaining about their products. The companies, in turn, sent money to placate him.

Further, the Manns discovered that Todd was removing himself from the home during the middle of the night, was shoplifting, consuming alcohol and using drugs. In fact, a little over a year before the support hearing, Ms. Mann discovered drug paraphernalia in Todd's school-bag. When Ms. Mann advised Todd that the matter would be attended to when Mr. Mann returned home from work, the youth left home and made his way to the Valley Youth House in New Jersey.

. The day after Todd removed himself from the Mann residence, a social worker from Valley Youth House notified Mr. Mann of his son's whereabouts, how he did not belong there, and that the family should work things out and take him home. Mr. Mann refused to do so until Todd had been given a drug and alcohol evaluation. Within a week, the test results proved positive for the presence of drugs. This caused Mr. Mann to send Todd to the Mountainview Home Rehabilitation Center. The youngster's stay at Mountainview Home lasted from October to mid-November of 1988, and this treatment was paid for by Mr. Mann's insurance company.

Once it was time to release Todd, the options available to the family consisted of having him stay with in-laws or a Korean man [1], all of whom had expressed interest in caring for the child. During this period, however, the cost of raising the child would be borne by Mr. Mann. At no time did Todd express any interest in returning to the Mann residence.

Although it appeared that the Korean man was going to raise the youth, the Manns informed him that they were going to see their other son in college, and, upon returning from their visit, they would inform this individual of their decision. However, upon their arrival home, the Manns were informed by the Korean man "very matter of factly ... that he was putting Todd ... in the Children's Home of

1. Todd was himself of Korean descent.

Reading." The Manns had never agreed to this move, nor had they signed any documents toward that end.

At any rate, it was an extended period of time before Mr. Mann wrote to Todd at Children's Home, *i.e.*, December 30, 1988. The letter contained a list of his personal belongings and a request for Todd's signature to language reading: "accept the terms and declare myself to be emancipated." This was done at the direction of Mann's attorney. Todd never acknowledged receiving the letter until the Manns drove to the Children's Home to deliver his possessions in late January of 1989.

Because Todd would not sign the letter, the Manns returned home without giving the child any of his personal belongings. Instead, the Manns wrote another letter informing Todd that if he wanted his possessions he would have to come home to retrieve them. Todd did so about a month later, but he was "adamant and hostile about it ... [and i]t was not a pleasant scene." No mention was made by Todd of his returning home; he merely took his belongings and left.

Since Todd has been away from home, he has written a single letter to the Manns advising them "he wanted absolutely nothing from [them]. That he was in no way interested in returning home." He also has spoken to them on the phone approximately five or six times, the most recent being mid-August of 1989. Moreover, until counsel for the plaintiff (Children's Home of Reading) had stated in court that Todd was "living in some sort of arrangement" in a private placement after leaving the Valley Youth House, the parents did not know where he was staying.[2]

The first time that the defendants learned that the plaintiff was seeking money for Todd's stay at "Our House",

**2.** According to plaintiff's counsel at the commencement of the support hearing, Todd was released by the Children's Home on August 19, 1989. He matriculated from there to the Manns' home, but because *he was not admitted* he was taken to the Valley Youth House and then to a private placement.

It appears that Todd spent time in treatment at Mountainview, and his counselor advised the defendants that he (Todd) should go to "Our House" at the Children's Home because the counselor "had very good

which is a youth drug and alcohol program with the Children's Home, was with the receipt of the complaint which initiated the suit.[3] As a result of the filing of the complaint, the previously discussed October 5, 1989, hearing was held and resulted in the entry of a court order directing the defendant/father to pay $650.00 per month for the support of his minor-child, retroactive to March 28, 1989, for and during the period the child remained in the Children's Home of Reading.

Posed for our consideration is the question of whether Todd, albeit under the age of eighteen, was "emancipated" during the time he was in the care and custody of the Children's Home so as to dispose of the defendant's "well-nigh" absolute obligation to support (and, in essence, pay for expenses incurred by a third-party caring for) the child.

Pursuant to 23 Pa.C.S. § 4323(a), a court shall not order either or both parents to pay for the support of a child who is "emancipated". The term "emancipated" is not defined in the definitions section of the support statute, 23 Pa.C.S. § 4302, or in the definitions section of the general provisions of the Pennsylvania Consolidated Statutes, 1

follow-up services with the Children's Home in Reading, and with the people th[at] he had sent there." On Todd's release from "Our House", Mr. Mann was contacted by Abe from Valley Youth House.
As an aside, we would point out that presently Todd is still covered under Mr. Mann's medical insurance.

3. The support action ("complaint") was filed initially in the Berks County Court of Common Pleas by Thomas Trosky, who was the Director of the private organization located in Berks County. He has since left the employ of the Children's Home.
In the complaint, Trosky sought to collect the monies claimed due ($9,142.00) from the defendant (James I. Mann) under provisions of the Pennsylvania Uniform Reciprocal Enforcement of Support Act (23 Pa.C.S. § 4501 et seq.) given that he resided in Lehigh County.
Trosky alleged in the complaint that the child-Todd was unable to earn income sufficient to provide for his support, and, as a result, incurred expenses at the Children's Home of $78.00 per day beginning on November 17, 1988.
The Berks County Court signed an order directing that the complaint be transmitted to Lehigh County for proceedings against the defendant.

374

Pa.C.S. § 1991. Moreover, although parents are liable for the support of their children who are unemancipated and eighteen years of age or younger, 23 Pa.C.S. § 4321(2), a child need not be supported by his parents, even though he is under eighteen years of age, *if he is emancipated.* Cf. *Griffin v. Griffin*, 384 Pa.Super. 188, 200, 558 A.2d 75, 81 (1989) (en banc) ("While parents *may be liable for* the support of children who are eighteen or older, parents *are liable* for the support of children who are unemancipated and eighteen or younger. 23 Pa.C.S. § 4321." (Emphasis in original)).

There is a dearth of appellate decisions in this Commonwealth with regard to whether parents are obligated to pay for expenses incurred by a third-party in the performance of services for a minor-child. Nonetheless, we are persuaded that the approach to take is a case-by-case determination on the issue of parental liability for their children's upbringing, *i.e.,* support. In this area of the law, our scope of review in support cases is limited. "[T]he amount of a support order is largely within the discretion of the trial court, and its judgment should not be disturbed on appeal absent a clear abuse of that discretion." *Costello v. LeNoir*, 462 Pa. 36, 40–41, 337 A.2d 866, 868 (1975).[4] As observed by our Supreme Court in *Melzer v. Witsberger*, 505 Pa. 462, 480 A.2d 991 (1984), parents are obligated to provide only for the "reasonable" expenses of raising their children. What constitutes a "reasonable" expense in raising children is based upon the particular circumstances— the needs, the customs, and the financial status—of the parties. Id. The *Melzer* Court pointed out, quoting with approval from the Supreme Court of Oregon in *Smith v. Smith*, 290 Or. 675, 626 P.2d 342, 344 (1981), that "child support itself may take forms other than direct monetary

4. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill will, as shown by the evidence or the record, discretion is abused. *In re Women's Homeopathic Hospital of Philadelphia,* 393 Pa. 313, 316, 142 A.2d 292, 294 (1958) (Citation omitted).

contribution.... It may take the form of payments for medical care." Id., 505 Pa. at 473, 480 A.2d at 996. This obligation remains inviolate, regardless of "the amount of time a parent spends with his or her children [since this] has no bearing on that parent's obligation of support. Even a parent who never sees his or her children has a duty to support those children to the best of his or her obligation." Id., 505 Pa. at 462 n. 6, 480 A.2d at 996 n. 6. Accord *Milne v. Milne*, 383 Pa.Super. 177, 205–06, 556 A.2d 854, 869 (1989) (en banc); *DeWalt v. DeWalt*, 365 Pa.Super. 280, 285–86, 529 A.2d 508, 511 (1987).

█ Moreover, in this Commonwealth, a parent has a stringent obligation to support a child aged eighteen or less. *Sutliff v. Sutliff*, 339 Pa.Super. 523, 547, 489 A.2d 764, 776 (1985). This is so even if he or she renounces the parent and refuses to see him or her. See *DeWalt*, supra, 365 Pa.Super. at 285–86, 529 A.2d at 511, citing *Schmidt v. Schmidt*, 313 Pa.Super. 83, 87, 459 A.2d 421, 423 (1983); 59 Am.Jur.2d, Parent and Child § 67 (1971). Especially is such an obligation to support extant where the child is mentally or physically deficient. See *DeWalt*, supra.

█ No one can deny the fact that Todd was physically dependent on drugs so as to warrant his admission into several drug rehabilitation programs. Moreover, no one can deny that the ingestion of drugs had a deleterious effect upon the child's mental well-being as evidenced by the impairment of his ability to function normally or maintain a stable relationship with his parents and siblings.

Even the testimony of Mr. Mann recounted a scenario in which Todd's social behavior was one bent on reprehensible conduct unacceptable as the norm in our society—stealing, consuming alcohol and drugs, and removing himself from the family residence late at night without advising his parents.

Todd's conduct toward his parents, *i.e.*, advising them in writing that he wished to sever all filial ties and having no desire to return home, is symptomatic of behavior gone awry and nurtured, possibly, by the minor's disenchantment

with the restraints on his freedoms by his parents and seeking release in non-combative behavior—drugs and pilfering. Nonetheless, despite the exhibition of such abnormal conduct, we have held that:

> A minor child is incapable of effective renunciation because of his age. A disabled child is incapable of effective renunciation because of the societal interest in preventing dependance [sic] upon the public weal.

*DeWalt*, supra, 365 Pa.Super. at 288, 529 A.2d at 512. Likewise, this Court in *Milne*, supra, in the course of adopting "estrangement" as an additional criterion in not awarding educational support to an adult child (over eighteen years of age) stated:

> ... we certainly will not consider pre-majority attitudes and behavior, as we all recognize that the maturity and restraint which can be expected of adults is not appropriately applied to evaluate children.

383 Pa.Super. at 190, 556 A.2d at 861. Factoring into the equation of support the element of "emancipation", which is a question of fact to be determined by the circumstances presented in each case, see *Maurer v. Maurer*, 382 Pa.Super. 468, 473–77, 555 A.2d 1294, 1297–98 (1989), as a legal term is useful, but only as a means of describing a result already reached, not as an analytical tool. Id. Stated otherwise, since the issue of the right to support arises in many ways, there are situations in which a child who would be considered "emancipated" [5] for other purposes would not be entitled to support and others in which he would be so entitled. See *Maurer*, supra.

**5.** In Pennsylvania, emancipation results not from any conduct of the child but from some juristic act, or other conduct of the parent from which the extinguishment of parental rights and filial duties may be inferred. See *Detwiler v. Detwiler*, 162 Pa.Super. 383, 385–87, 57 A.2d 426, 428 (1948). However, this is not to imply that the parent may take the initiative in establishing the child's "emancipation" resulting in a termination of the parent's obligation to support. Rather, whether the child is under the "care and custody" of the parent was looked to under the common law to determine if a minor were "emancipated." Id.; *Com., Dept. of Public Welfare*, 60 Pa.Cmwlth. 403, 406–07, 431 A.2d 1135, 1138 (1981). Today, we look to a host of

With the preceding as a backdrop, it becomes clear that "emancipation" may not be thrust into the forefront without an examination of the circumstances which might have prompted such a finding, a conclusion which we assume for the sake of argument. Instantly, we had *no testimony* that Todd was in any position to support himself financially. In fact, the complaint filed in this case alleged, at paragraph 5, that the minor-child was "unable to earn income sufficient to provide for his ... support." Further, when Todd informed his father that he was being released from "Our House", which is an extension of the Children's Home, he was told that the father would be vacationing at the time and would not be home to receive him. Even when a counselor asked Mr. Mann if Todd could return home, he was informed by the father that:

> ... It was a mute [sic] point for Todd to—for us to say that he could return home when in fact he has never wanted to return home, and still does not want to return home. And under, without any duress whatsoever, with a letter that he wrote quite freely, indicating in writing that he did not want to return. And I was not going to chase him all over the country side.

Also, Mr. Mann made it crystal clear in his phone conversations with Todd that the child had "burnt the bridges" with the defendant-father and the mother, as well as the other three children in the family. Notwithstanding this admission of disassociation, the defendant conceded that he took Todd as a deduction on his 1988 income tax return since he resided with Mr. Mann for nine months of that year.

We find the actions of the minor-child are not consistent with the presence of "emancipation"—he could not support himself, he sought refuge with a private placement service while recovering from his dysfunction (drug addiction), one of the factors which prompted him to leave his home unilaterally. See generally *Maurer*, supra.

factors in deciding the status of a child as "emancipated". See *Maurer*, supra.

It becomes clear that emancipation may not arise by the abandonment of the child by his father, which appears to have occurred at bar, or by the mere ability of the child to write a disconcerting letter of disassociation with his adopted parents and engaging in caustic conduct upon receipt of his personal belongings at the defendant's residence. To this add the fact that his parents requested, as a condition precedent to the release of his belongings, a signature on a letter admitting to the child's "emancipation." In toto, the environment was not one conducive to reconciliation and amelioration of the chasm of distrust and animosity that had developed between the child and the parents.

As referred to earlier in this opinion, at common law the duty to support a child and provide for him or her with *necessities* of life carried with it the right of association and was reciprocal in that the parents had a right to the child's services. See *Milne*, supra. Today, such a duty is absolute with regard to the minor-child and does not depend on access of the parent to the child. *Id.*

In our society, it is a sad commentary to admit that addiction to drugs has reached epidemic proportions requiring the government to launch an all out "war" to inhibit its spread, along with its eradication. In this context, knowing the damaging effect drugs has on the individual, his family, friends and the community at large, we cannot ignore its elimination and treatment of those afflicted as a "necessity" of life to be paid, in our situation, by the parent of the child treated. See *Melzer*, supra; *DeWalt*, supra. Because there is no denying the parent's ability to pay for the services rendered to Todd, the need for which is not disputed by any of the litigants, the Children's Home is entitled to receive reimbursement for services rendered to the minor-child. Cf. *Madison General Hosp. v. Haack*, 124 Wis.2d 398, 369 N.W.2d 663, 667 (1985).

Order affirmed.

HESTER, J., files a concurring and dissenting statement.

HESTER, Judge, concurring and dissenting.

I concur with that portion of the majority's exceptionally well-reasoned opinion which addresses the issue as to whether Todd Mann is emancipated. I agree that under the undisputed facts in this appeal, he cannot be considered as emancipated.

I am constrained to dissent from only that portion of the majority's opinion which affirms the support order of $650 per month for Todd. There is nothing in the record that indicates that $650 per month constitutes a reasonable expense in raising Todd. Appellants have three other children. The Hearing Court should have considered, on the record, the needs, the customs and the financial status of all the parties involved, not only Todd.

This is an unusual situation. Todd removed himself from his parents' residence. He was never committed to the Children's Home of Reading. A public agency is not seeking support for Todd. The Children's Home has requested and received an order for $78 per day.

I would remand to the trial court to conduct an evidentiary hearing to ascertain the needs, the customs and the financial status of all the involved parties and then determine the amount appellants should pay for Todd's support.